FIFTH DIVISION

No. 1-06-3597

| | | |
|---|---|---|
| STACEY GREGORY, Individually and as Special Administrator of the Estate of Larry Gregory, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 05 L 3782 |
| BEAZER EAST, BONDEX INTERNATIONAL, EXXON MOBIL, GEORGIA-PACIFIC CORPORATION, and UNION CARBIDE CORPORATION, | ) ) ) ) ) | |
| Defendants-Appellees | ) ) | |
| (A.W. Chesterton, BMI, a/k/a Blow Mix, Inc., Brand Insulation, Certainteed Corporation, Chicago Bridge and Iron, Commonwealth Edison, Foseco, Inc., Garlock Sealing Technologies, General Electric, Ingersoll Rand, John Crane, Inc., Lincoln Electric Corporation, Metropolitan Life Insurance Company, Pittsburgh Metals Purifying, a/k/a Treesdale, Inc., Reynolds Aluminum, Riley Stoker, Ryco, Inc., formerly Ryco Chemical, T.H. Agriculture and Nutrition, U.S. Steel Corporation, U.S.I. Chemical Company, f/k/a Northern Petrochemical, and Westinghouse Electric, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants). | ) ) ) | The Honorable Mary A. Mulhern, Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Plaintiff-appellant Stacey Gregory, individually and as special administrator of the estate

of her deceased husband Larry Gregory (plaintiff),[1] filed a complaint at law in Illinois sounding

_____

[1]Larry Gregory initially filed suit in this cause; following his death, his wife Stacey

(plaintiff) has pursued his cause in her name individually and in the name of his estate. The

estate includes plaintiff and five minor children.

No. 1-06-3597

in negligence against a multitude of defendants,[2] including defendants-appellants Beazer East (Beazer), Bondex International (Bondex), Exxon Mobil (Mobil), Georgia-Pacific Corporation (Georgia-Pacific) and Union Carbide Corporation (Union Carbide), regarding her husband's contraction of mesothelioma and subsequent death. Mobil moved for summary judgment on various grounds, and the trial court granted this motion finding that Mobil owed no duty to decedent Larry. Meanwhile, Union Carbide moved for the application of Indiana law rather than Illinois law, and Georgia-Pacific joined in this motion. The trial court granted the motion, finding that choice-of-law factors in the cause favored Indiana law. Georgia-Pacific subsequently moved for summary judgment based on the Indiana statute of repose, and the trial court granted the motion finding that Indiana's statute of repose barred plaintiff's claim against Georgia-Pacific.

Pursuant to motions presented before this court, Bondex was dismissed as a party to the appeal on March 14, 2007, Union Carbide was dismissed as a party on July 25, 2007, and Beazer was dismissed as a party on December 19, 2007, thereby leaving only Mobil and Georgia-Pacific as relevant defendants. On appeal from the grant of Mobil's motion for summary judgment and Georgia-Pacific's motion for the application of Indiana law, plaintiff contends that the trial court erred in finding that Mobil owed no duty to Larry to warn him of the presence of asbestos in its facility where he worked and that the trial court erred when it determined that Indiana law

_____

[2]The defendants labeled as such in the caption of this appeal have all reached settlement with plaintiff and have been dismissed from the cause; accordingly, they are not parties to, and take no part in, the instant appeal.

2

applied to the claim against Georgia-Pacific for manufacturing and selling its joint compound without including a warning that this product contained asbestos. Plaintiff asks that we reverse the order granting summary judgment to Mobil and remand the matter for further proceedings. Plaintiff also asks that we reverse the order finding that Indiana law applies and enter judgment that Illinois law applies and, accordingly, reverse the order granting summary judgment to Georgia-Pacific; alternatively, plaintiff asks that we reverse the order finding that Indiana law applies, reverse the grant of summary judgment to Georgia-Pacific, remand the matter for further proceedings, and grant any other appropriate relief. For the following reasons, we affirm.

BACKGROUND

Larry worked as a pipe fitter. He was a life-long resident of Indiana; plaintiff and the beneficiaries of Larry's estate are also Indiana residents. In 1970-71, Larry worked for four months at a Mobil project in Joliet, Illinois, which consisted of the initial construction of a refinery. Mobil hired Fluor Corporation (Fluor) as the general contractor on that job; Chicago Bridge & Iron (CBI) became the contractor for the welding portion of the work, and CBI hired Petroleum Piping as a subcontractor. Larry was employed by Petroleum Piping and was one of eight pipe fitters from Petroleum Piping hired to do the welding work at the Mobil project. Larry was supervised daily by a CBI inspector and received all his instructions and tools from Petroleum Piping. Although Mobil made the ultimate decisions regarding acceptance or rejection of the work, design changes, and work stoppage, Larry did not look to Mobil for direction, supervision or anything else regarding the project. Joseph D'Ambrisi, a former Mobil manager of the Joliet refinery, confirmed this in his deposition in this cause. D'Ambrisi testified

that Fluor supervised the Joliet construction site and had "total responsibility for the construction of the refinery," including selecting the subcontractors and managing their work. D'Ambrisi further testified that Mobil did not have any inspectors, supervisors or workers of its own at the site; while Mobil monitored the progress of the refinery's construction and had a general right to control access to the property, it had contracted with Fluor to "supervise, inspect, expedite and control all phases of the work."

Larry performed hot welding inside and outside of the pipes at the refinery. During his four months at the Mobil plant, he worked mainly on the cat cracker, an important piece of machinery, still present today, that refines oil and stirs it into gasoline. To protect against the heat from the pipes, Larry used blankets and gloves containing asbestos, which were supplied by CBI. He used these items repeatedly, until they could no longer be used. At this time, no one told Larry that there was asbestos in these items or that asbestos could be harmful to his health, and no one provided him with any respiratory aides or other protective materials at the jobsite.

In addition to his work at the Mobil refinery, Larry testified that he completed approximately 150 home remodeling jobs on the side from 1966 to 1976, mainly in Illinois. Principally, he would remove and replace plumbing and toilets in bathrooms. This sometimes required him to replace and reinstall drywall. Larry testified that beginning in 1972, he used a premix joint compound on these jobs made by Georgia-Pacific to mud the drywall seams and make them smooth. Larry would apply the compound, let it dry and then sand it, a process he would repeat three times. This resulted in a great amount of dust. There were no warnings for asbestos exposure on Georgia-Pacific's packaging of the compound at that time. Georgia-Pacific

4

discontinued manufacturing all asbestos-containing products in 1977. Larry could not remember any of the names of his remodeling clients or the addresses of his jobsites, nor could he produce any receipts indicating when he did these jobs. Affidavits were included in the record from Larry's former wife and a coworker both testifying that, although they knew Larry at this time, they never saw him perform such remodeling jobs in addition to his welding work.

Following his initial work at the Mobil refinery, Larry returned to do periodic jobs there several times in the 1970s, 1980s and 1990s in different capacities and for different contractors. For example, in 1974-75 he worked for a time for a contractor called Hunter in the coker units of the refinery removing gaskets and replacing pipe insulation, which generated dust. Also, in the 1980s and 1990s, he worked for a contractor called BMW, performing maintenance and shutdowns of various portions of the refinery, which included removing gaskets, stripping old insulation and working with welding rods, all of which generated dust. As with his initial work there, Larry was supervised and directed by his contractors and received no supervision or direction from anyone at Mobil during any of these jobs.

Larry went on to work for several other employers at several different jobsites, principally in Indiana, where, he admitted, he was exposed to asbestos. The majority of his income during his years of work was derived from his work in that state.

Larry was diagnosed with mesothelioma, which was medically attributed to asbestos exposure. In 2005, he brought a negligence suit in Illinois against, among others, Mobil, due to the time he spent working at the Joliet refinery, and Georgia-Pacific, due to his use of its product in his Illinois remodeling jobs. Larry alleged that Mobil failed to warn him of the presence and

danger of asbestos at the refinery, and that Georgia-Pacific manufactured and sold its joint compound without warning him that it contained asbestos, exposure to which was dangerous. During the pendency of this litigation, Larry died.

As the cause progressed, Mobil moved for summary judgment on several grounds, alternatively asserting that the Illinois statute of repose barred plaintiff's claim, that it owed no duty to Larry as the employee of an independent contractor, and that Larry could not provide sufficient evidence in support of the proximate causation element of negligence. The trial court granted Mobil's motion on the basis that it owed no duty to Larry. First, the court noted that plaintiff could only specifically identify Larry's exposure to asbestos at Mobil through the asbestos blankets and gloves he used in his four-week project there in 1970-71. Then, upon examining the evidence, the court concluded that "there is no evidence that Mobil controlled the means or methods by which [Larry] performed his work on Mobil's premises." The court reasoned that, pursuant to section 414 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 414 (1965)), it was not enough that Mobil had the general right to control the progress of the work, but rather, to impose a duty on it, Mobil must have retained the right to control the way the contractor did the work. The court found that because CBI had provided the asbestos items and because there was "no evidence *** that Mobil had any role whatsoever in 'constraining' " Larry to use them or directed him in his work, Mobil did not owe him any duty. Plaintiff filed a motion to reconsider. In its order denying this, the trial court struck "all references" to Larry's discovery deposition, finding that this deposition was "not admissible as affirmative evidence."

6

Meanwhile, Georgia-Pacific joined a motion filed by Union Carbide requesting the application of Indiana law. The trial court granted this motion. The court noted that Larry lived in Indiana at all times relevant to this cause; he worked in Indiana at U.S. Steel, Gary Works for 10 of his 39 years as a pipe fitter, as well as various other Indiana locations; and that while it was clear that he did work at other locations in Illinois, the extent and duration of these jobs was "in dispute." Applying section 145 of the Restatement (Second) of Conflict of Laws (Restatement (Second) of Conflict of Laws § 145 (1971)), the trial court employed the "most significant relationship" test and, upon discussing its factors as they related to the facts presented, held that "Indiana law is appropriate here since [Larry] was domiciled in Indiana, the injury and injury-causing conduct is alleged to have occurred both in Indiana and outside of Indiana, and *** the relationship of the parties[ ] is irrelevant since there is no relationship alleged."

Following this order, Georgia-Pacific moved for summary judgment, asserting that Indiana's 10-year statute of repose barred plaintiff's action. Again examining the facts of the case, the trial court noted that Larry's evidence deposition stated he stopped using the Georgia-Pacific joint compound in 1976 but did not file his lawsuit until 2005, almost 30 years later. Based on this, the court granted Georgia-Pacific's motion and entered summary judgment in its favor.

ANALYSIS

As noted, plaintiff raises two arguments on appeal, namely, that the trial court erred in finding Mobil did not owe a duty to Larry to warn him of the presence of asbestos at the refinery, and that the trial court erred when it determined Indiana law applied to the claim against Georgia-

Pacific for manufacturing and selling its joint compound without including a warning that its product contained asbestos. Mobil and Georgia-Pacific have responded to plaintiff's arguments in their own respective briefs on appeal.

## I. Plaintiff's Claim Against Mobil

As a threshold matter, we note that Mobil attributes error to plaintiff's statement of facts in her brief on appeal because it includes statements made by Larry during his discovery depositions in this cause.[3] Mobil insists that in the trial court's denial of plaintiff's motion to reconsider the order of summary judgment in its favor, the trial court struck "all references" to Larry's discovery deposition testimony as inadmissible because it was "affirmative evidence" and, thus, plaintiff cannot refer to it on appeal. Plaintiff responds that both she and Mobil cited the discovery depositions when arguing the motion for summary judgment and no party objected to their use until after the trial court entered summary judgment, *i.e.*, that Mobil waited to object until the hearing on the motion to reconsider; plaintiff asserts that this does not change the fact that the discovery depositions were utilized in reaching summary judgment, "which is all that is now at issue." The rule in Illinois is that information in a deceased's discovery deposition is prohibited and cannot be used as evidence when he was a party to the cause and his evidence deposition has also been taken. See, *e.g.*, Longstreet v. Cottrell, Inc., 374 Ill. App. 3d 549 (2007), citing 210 Ill. R. 2d 212(a). Accordingly, it is Mobil that presents the proper position for this argument on review, and we therefore have focused our decision on the facts contained in

---

[3]Larry gave two discovery depositions: one on August 24, 2005, and one on September 12, 2005. He gave a subsequent evidence deposition on October 1, 2005.

No. 1-06-3597

Larry's evidence deposition.[4]

Turning now to the merits of plaintiff's claim, we note that plaintiff appeals from the trial court's grant of summary judgment to Mobil finding that it did not owe a duty to Larry as the employee of an independent contractor. Summary judgment is proper when the pleadings, affidavits, depositions and admissions of record, construed strictly against the moving party, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Morris v. Margulis, 197 Ill. 2d 28, 35 (2001); accord Purtill v. Hess, 111 Ill. 2d 229, 240-44 (1986); Zakoff v. Chicago Transit Authority, 336 Ill. App. 3d 415, 420 (2002). While this relief has been called a "drastic measure," it is an appropriate tool to employ in the expeditious disposition of a lawsuit in which " 'the right of the moving party is clear and free from doubt.' " Morris, 197 Ill. 2d at 35, quoting Purtill, 111 Ill. 2d at 240. Appellate review of a trial court's grant of summary judgment is *de novo* (see Rich v. Principal Life Insurance Co., 226 Ill. 2d 359, 370 (2007); accord Outboard Marine Corp. v. Liberty Mutual Insurance Co., 154 Ill. 2d 90, 102 (1992); Zakoff, 336 Ill. App. 3d at 420), and reversal will

---

[4]Plaintiff and Mobil seemingly agree on appeal that the only differences between Larry's discovery and evidence depositions is that in his discovery depositions, Larry described that there were fans at the refinery circulating fibers in the air, that the blankets he used produced dust when shaken, that workers would lose their jobs if they complained, and that the insulation and gaskets he worked with subsequent to his initial welding work at the refinery in the 1970s contained asbestos. Pursuant to our discussion below, we find that even were this information admissible, it would not change the outcome of this cause.

9

occur only if we find that a genuine issue of material fact exists (see Addison v. Whittenberg, 124 Ill. 2d 287, 294 (1988)).

Plaintiff asserts on appeal that a genuine issue of material facts exists as to Mobil's control over the Joliet refinery work site and, consequently, whether it owed a duty to Larry. Specifically, plaintiff insists that during the 1970s when Larry used the asbestos blankets,[5] Mobil controlled the work site as exemplified by its authority to stop work, check work progress and control general access to the site and, thus, owed him a duty of care. However, based on the record before us, we find that there were no genuine issues of material fact remaining here and the trial court's grant of summary judgment was proper.

While a plaintiff need not prove her entire cause during summary judgment, she must present some evidentiary facts to support the elements of her cause of action. See Bellerive v. Hilton Hotels Corp., 245 Ill. App. 3d 933, 936 (1993). To properly state a cause of action for common law negligence, the plaintiff must show that the defendant owed a duty, that the

---

[5]Plaintiff also asserts that there was a second instance of exposure, namely, when Larry returned to work at the refinery in the 1980s and 1990s removing insulation and gaskets from the pipes. However, we note for the record that the trial court specifically limited its consideration of plaintiff's claim to Larry's work during his first stint at the refinery for four months during 1970-71, which involved only his exposure to asbestos blankets and gloves. Regardless of this fact, and as per our discussion below, our decision that Mobil owed no duty to Larry would be just as applicable to the alleged second instance of exposure as to the first dealing with the blankets and gloves.

10

defendant breached that duty, and that this breach was the proximate cause of the resulting injuries. See Heastie v. Roberts, 226 Ill. 2d 515, 555-56 (2007); Bermudez v. Martinez Trucking, 343 Ill. App. 3d 25, 29 (2003). Thus, duty is an essential element of a negligence claim; unless the plaintiff can demonstrate that a duty is owed, namely, that she and the defendant stood in such a relationship that the law imposes an obligation on the defendant to act reasonably for her protection, there can be no negligence imposed upon the defendant. See American National Bank & Trust Co. v. National Advertising Co., 149 Ill. 2d 14, 26 (1992); see also Wood v. Village of Grayslake, 229 Ill. App. 3d 343, 349 (1992) (court must weigh foreseeability of injury against burden to be placed on the defendant and consequences thereof). Whether a duty of care exists is a question of law, appropriately determined by the trial court on a motion for summary judgment. See Bonner v. City of Chicago, 334 Ill. App. 3d 481, 483 (2002).

Specifically, in construction negligence cases such as this one, it is the general rule that an owner who employs an independent contractor to do work is not liable for the independent contractor's acts or omissions. See Calderon v. Residential Homes of America, Inc., No. 1-07-1740, slip op. at 10 (March 26, 2008); Pestka v. Town of Fort Sheridan Co., 371 Ill. App. 3d 286, 300 (2007); Martens v. MCL Construction Corp., 347 Ill. App. 3d 303, 313 (2004). This is because the owner generally does not supervise the details of the independent contractor's work and, thus, is not in a good position to prevent negligence, whereas the independent contractor's employees have submitted to the independent contractor's right to monitor and direct such details as their employer. See Calderon, slip op. at 10; Pestka, 371 Ill. App. 3d at 300; Martens, 347 Ill.

App. 3d at 313-14.  However, section 414 of the Restatement (Second) of Torts presents the "retained control exception" to this general rule, which states:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."  Restatement (Second) of Torts § 414, at 387 (1965).

See also Calderon, slip op. at 10-11; Martens, 347 Ill. App. 3d at 314.

Section 414, therefore, renders the retention of control key in imposing liability.  See, *e.g.*, Martens, 347 Ill. App. 3d at 315 (whether a duty exists under section 414 "turns on whether the defendant controls the work in such a manner that he should be held liable").  The comments accompanying section 414 discuss " 'a continuum of control' " from which our courts have gleaned the necessary degree of control a defendant must exercise to be subject to liability under this section.  Calderon, slip op. at 11, quoting Martens, 347 Ill. App. 3d at 314.  In particular, Comment *c* states:

> "In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done.  It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations.  Such a general right is usually reserved to employers,

12

but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414, Comment *c*, at 388 (1965).

In the instant case, it is clear that Mobil did not retain the degree of control necessary to impose liability upon it. Larry testified that during his initial work at the refinery in 1970-71, he worked directly for Petroleum Piping, which had been subcontracted to do the welding work by CBI (the general contractor of the welding portion of the project), which, in turn, had been hired by Fluor (the general contractor of the whole project), which had been hired by Mobil. Larry further testified that he was one of eight pipe fitters who were supervised on a daily basis by CBI, which provided an inspector on the project, and Larry received all his tools and instructions for his work from Petroleum Piping. Larry made clear for the record that Mobil did not provide any direction or supervision of his welding tasks regarding the project and that he, indeed, did not look to Mobil for this. Larry stated later that this was also true for his subsequent work projects at the refinery in the 1980s and 1990s, where he worked directly for several contractors such as Hunter and BMW, but never directly with Mobil. Most specifically, Larry confirmed that Mobil did not provide him with the asbestos blankets or gloves, nor directed or ordered him to use them; these were supplied by CBI.

In addition to this evidence, former Mobil refinery manager D'Ambrisi testified that general contractor Fluor, not Mobil, supervised the Joliet work site and had "total responsibility for the construction of the refinery," including, specifically, selecting the subcontractors, such as

CBI and Petroleum Piping, and managing their work. Further corroborating Larry's admissions regarding Mobil's lack of control, D'Ambrisi testified that Mobil did not have any inspectors, supervisors or workers of its own at the site, but had, instead, contracted with Fluor to "supervise, inspect, expedite and control all phases of the work."

From all this, while it may be true that Mobil had the general right to stop work, monitor its completion and control access to the site, these were simply general rights it had as the ultimate employer on the construction project. See Restatement (Second) of Torts § 414, Comment *c*, at 388; Pestka 371 Ill. App. 3d at 301 ("recent decisions on this topic found that the reservation of a right to inspect, start and stop work, order changes to specifications and plans, and ensure that the work was done safely did not show that the general contractor retained control over the independent contractor's work"). By Larry's own admission, Mobil clearly did not control the means and method of his work, which would have otherwise imposed upon it a duty owed to him.

Plaintiff relies on five principal cases in its initial and reply briefs on appeal, insisting that they are analogous to the instant cause and should control our decision. We disagree and find each of them distinguishable. First, while the reviewing courts in both Moorehead v. Mustang Construction Co., 354 Ill. App. 3d 456 (2004), and Wilkerson v. Paul H. Schwendener, Inc., 379 Ill. App. 3d 491 (2008), reversed summary judgment orders in favor of general contractors, those cases involved contracts regarding work-site safety. That is, in Moorehead, a question of fact regarding a general contractor's control over a work site remained because the general contractor had contracted with the subcontractor to " 'be fully and solely responsible for the jobsite safety.' "

14

<u>Moorehead</u>, 354 Ill. App. 3d at 461. Similarly, in <u>Wilkerson</u>, a construction contract signed by the general and subcontractors required the subcontractors to attend the general contractor's safety meetings, comply with the general contractor's list of 21 safety procedures, hold their own weekly safety meetings and submit minutes of those meetings to the general contractor, and submit a site safety plan to the general contractor for approval. See <u>Wilkerson</u>, 379 Ill. App. 3d at 496. Unlike the instant cause, which does not involve any contractual provisions, it is clear that summary judgment could not be properly granted in <u>Moorehead</u> and <u>Wilkerson</u> since written contracts called into question which party--the generals (*i.e.*, Mobil here) or subcontractors (*i.e.*, Petroleum Piping or CBI here)--controlled safety measures at the work sites.

Moreover, while the remaining cases cited by plaintiff, namely, <u>Bokodi v. Foster Wheeler Robbins, Inc.</u>, 312 Ill. App. 3d 1051 (2000), <u>McConnell v. Freeman United Coal Co.</u>, 198 Ill. App. 3d 322 (1990), and <u>Dillon v. U.S. Steel Corp.</u>, 159 Ill. App. 3d 186 (1987), also found that questions of fact remained as to whether the owners of a site had sufficient control over the projects as to create liability for injuries to the employees of independent contractors, the facts of those cases are wholly different from those presented here. For example, the <u>Bokodi</u> court reversed an award of summary judgment in favor of a general contractor on the plaintiff's construction negligence claim after finding that the general contractor "went to great lengths to control the safety standards at the work site," including employing a site manager, a field superintendent and a safety manager who held weekly meetings to particularly discuss safety, conducted regular walkthroughs of the site and required subcontractors to abide by 29 different safety measures. See <u>Bokodi</u>, 312 Ill. App. 3d 1063-64. Likewise, the <u>McConnell</u> court reversed

15

a summary judgment order in favor of a site owner following an injury to the employee of an independent contractor where the record revealed that the owner's own employees visited the site on a regular basis, its vice-president would go to the jobsite and discuss work progress with the independent contractor, it placed two additional employees at the site regularly during business hours, one of these employees would confer with the independent contractor's foreman on a daily basis, and no work could continue unless this owner's employee approved it. See McConnell, 198 Ill. App. 3d at 327. And in Dillon, verdicts in favor of a worker and his independent contractor-employer against a steel company were affirmed where the steel company supervised the molding process which eventually injured the worker, analyzed the particular molten steel with which he was working earlier on the day of the injury, had been directing him on the day of the incident, ordered him to immediately lance the steel which caused his injury, and had the responsibility to see to the safety of all employees and protect them from the dangers of molten steel. See Dillon, 159 Ill. App. 3d at 197-98.

These cases cited by plaintiff present situations where questions remained regarding the imposition of liability on jobsite owners or general contractors who may have owed a duty to the injured workers due to their pervasive day-to-day supervision of the sites, as this exhibited retained control over the projects. Having reviewed the facts in the instant case, which, by Larry's own admission, clearly demonstrate that Mobil did nothing even remotely similar to the owners or general contractors in Moorehead, Wilkerson, Bodoki, McConnell and Dillon to retain control over the Joliet refinery, we find that plaintiff has failed to raise any genuine issue of material fact as to whether Mobil owed Larry a duty. Due to the minimal involvement Mobil

16

exercised in the instant cause, summary judgment in its favor was proper. See Calderon, slip op. at 16-18 (summary judgment in favor of general contractor in construction negligence action brought by employee of roofing subcontractor was proper where general contractor did not control safety at work site nor means and methods of subcontractor's work); Pestka, 371 Ill. App. 3d at 302-03 (where no evidence was presented to show that property owner controlled the operative details of the contractors' work so that the contractors' employees were not entirely free to perform the work in their own way, the property owner could not be liable for injury sustained by contractors' employee and, thus, summary judgment in owner's favor was proper); Martens, 347 Ill. App. 3d at 316-20 (summary judgment in favor of general contractor and against subcontractor's employee in construction negligence action was proper where general contractor did not retain sufficient control over subcontractor's work so as to impose duty and subsequent liability); see also Kotecki v. Walsh Construction Co., 333 Ill. App. 3d 583, 587 (2002) (summary judgment for landowner and general contractor proper where the plaintiff-injured employee "offered no evidence" that they controlled his work "and, in fact, admitted in his deposition that his employer alone controlled the manner by which he completed his" assignment).

Plaintiff argues that Mobil's right of control was blatant when, following abatement procedures set in the 1990s, it had the ability to, and did in fact, shut down areas of the refinery when an employee would present a suspected case of asbestos, and because Mobil tightened security in these later years. Plaintiff insists that "any such power that Mobil had in the 90s and thereafter must have been the same power or right of control it had back in the early 70s when

17

Larry Gregory first worked there, because [Mobil's] status as owner and its rights from that status remained a constant during that period." Even were this true, we have already discussed that the reservation of a right to inspect, start and stop work, order changes and ensure that the work is done safely does not, in and of itself, show that the owner retained control over the independent contractor's work, thereby imposing a duty upon the owner. See Pestka, 371 Ill. App. 3d at 301; see also Martens, 347 Ill. App. 3d 316, 318. To the contrary, our courts have held that even if, for example, the owner was responsible for initiating and supervising a safety program, provided a safety manual that was to be followed, or hired a safety director, this "does not constitute retained control *per se*; the court must still conduct an analysis pursuant to the section 414 retained control exception." Martens, 347 Ill. App. 3d at 318; accord Pestka, 371 Ill. App. 3d at 301 (question still turns on whether the owner so controlled the operative details of the subcontractor's work so that the subcontractor's employees were not entirely free to perform the work in their own way). Only if such a safety program sufficiently affected the subcontractor's employees' means and methods of doing their work would the program possibly bring the owner within the ambit of the retained control exception. See Martens, 347 Ill. App. 3d at 318-19. This was not the case here where Mobil did not provide any asbestos materials and did not supervise the work done at the refinery. Pursuant to Larry's own deposition testimony, as well as that of refinery manager D'Ambrisi, we find plaintiff's argument that an issue of control was created by Mobil's ability to control security and shut down areas of work for asbestos abatement to be unpersuasive.

Finally, plaintiff presents an alternate theory of liability against Mobil, insisting that

18

summary judgment was improper because Mobil was also potentially liable to Larry pursuant to section 343 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 343 (1965)), as the owner and possessor of the land upon which the refinery was built. An owner or possessor of land owes its invitees a common law duty of reasonable care to maintain its premises in a reasonably safe condition (Deibert v. Bauer Brothers Construction Co., 141 Ill. 2d 430, 437-40 (1990)), but no legal duty arises unless the harm is reasonably foreseeable (Renslow v. Mennonite Hospital, 67 Ill. 2d 348, 354-55 (1977)). Section 343 states:

"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger."

Restatement (Second) of Torts § 343, at 215-16 (1965).

Plaintiff's premise liability argument fails for several reasons. First and foremost, the source of Larry's mesothelioma relevant to this portion of the cause was the asbestos blankets and gloves. These were items provided at the refinery by CBI and, thus, cannot be said to be a *condition on the land* of the refinery owned by Mobil in order for section 343 to be operative here. See Quinton v. Kuffer, 221 Ill. App. 3d 466, 472 (1991) (where subcontractor's employee

sought to impose premise liability upon owner of land for failing to inform him of warning label on drum which exploded and caused him injury, summary judgment for owner was proper as warning label and drum were not "conditions on the land" as required by section 343, even though drum was located on the property); Hinojosa v. City of Chicago Heights, 166 Ill. App. 3d 319, 325 (1988) (premise liability does not apply when injury is caused by independent actions of third party and not by condition on the land of the owner); see, *e.g.*, Recio v. GR-MHA Corp., 366 Ill. App. 3d 48 (2006). Second, even were we to consider the blankets and gloves a "condition on the land," no evidence was presented that Mobil knew or should have known that the blankets and gloves contained asbestos. Once again, Larry admitted that CBI, not Mobil, supplied the blankets and gloves to Petroleum Piping's welders, that Mobil did not supervise the welding work in any manner, and that Larry did not receive any direction or instruction from Mobil. In addition, D'Ambrisi made clear that Mobil did not have any of its own workers at the site, did not have responsibility for the construction and did not control any of the phases of the work. Thus, no evidence indicates that any of Mobil's staff observed any unsafe condition, had control or even regular access to the construction site, or received any complaint about it that would indicate that Mobil knew or should have known that the blankets and gloves were being used and contained asbestos. Compare Cochran v. George Sollitt Construction Co., 358 Ill. App. 3d 865, 873 (2005) (no duty of care owed to subcontractor's employee under premise liability theory where general contractor-defendant did not know of unsafe condition), with Wilkerson, 379 Ill. App. 3d at 797-98 (summary judgment not proper where the record showed, and it was never disputed, that the general contractor knew the injured subcontractor's employee was

balancing on narrow beams nine feet above the ground to complete work and did not provide protection even though general contractor's own safety regulations so required).

Therefore, based upon the record in this cause, we hold that the trial court's grant of summary judgment in favor of Mobil here on the basis that it owed no duty to Larry was proper as a matter of law.[6]

## II.  Plaintiff's Claim Against Georgia-Pacific

Plaintiff's second, and final, contention on appeal is that the trial court erred in determining that Indiana, not Illinois, law applied to her claim against Georgia-Pacific.  Plaintiff asserts that the court improperly "lumped all the defendants and all [Larry's] exposures together, and then weighed that group of contacts to determine the choice of law" when, instead, it was required to examine each defendant separately according to the rules of depecage.  Plaintiff further asserts that had the trial court done this, it would have undoubtedly reached the conclusion that several factors exemplify a significant relationship in this cause to Illinois rather than Indiana, which "was critical *** because Indiana has a restrictive product statute of repose" and, "unless Illinois law applies," her claim here "would be defeated."

A trial court's choice-of-law determination is reviewed *de novo*.  See Townsend v. Sears, Roebuck & Co., 227 Ill. 2d 147, 153 (2007).  This is because the task of evaluating and balancing

---

[6]Since we have found no duty owed, we need not address the other required elements of negligence, even though Mobil has cautiously done so in its brief on appeal.  See American National Bank, 149 Ill. 2d at 26.

the choice-of-law factors, which are embodied in the Restatement (Second) of Conflict of Laws, is a matter of law rather than one of fact. See Townsend, 227 Ill. 2d at 154.

A choice-of-law determination is required only when a difference in law will make a difference in the outcome of a cause. See Townsend, 227 Ill. 2d at 155; see also Barbara's Sales, Inc. v. Intel Corp., 227 Ill. 2d 45, 58 (2007) ("choice-of-law problems arise when significant aspects of a lawsuit traverse state borders"). In the instant case, plaintiff and Georgia-Pacific agree that there is a conflict in the laws of Illinois and Indiana regarding these states' statutes of repose, with Indiana's being more restrictive in that it bars an action not filed within 10 years of exposure to a product. Accordingly, plaintiff argues for the application of Illinois law while Georgia-Pacific has consistently asserted that Indiana law is proper.

As a threshold matter, we address the concept of *depecage* as raised by plaintiff and Georgia-Pacific on appeal. Plaintiff initiates her choice-of-law argument in her brief by asserting that the trial court's error occurred when it conducted its choice-of-law analysis on the case as a whole, rather than limiting its analysis to plaintiff's claim against this particular defendant (Georgia-Pacific) only, under the auspices of *depecage*. Georgia-Pacific, meanwhile responds by stating that plaintiff has waived this argument for review and, alternatively, misapplies the concept of *depecage*. For the reasons that follow, we must agree with Georgia-Pacific.

*Depecage* is "the process of cutting up a case into individual issues, each subject to a separate choice-of-law analysis." Townsend, 227 Ill. 2d at 161. This is in line with the approach taken in Illinois pursuant to the Restatement (Second) of Conflict of Laws, which focuses on a "selective, issue-oriented approach to determining choice-of-law for a particular issue presented"

22

in a cause of action. <u>Townsend</u>, 227 Ill. 2d at 161; see <u>Barbara's Sales</u>, 227 Ill. 2d at 61, citing

<u>Morris B. Chapman & Associates, Ltd. v. Kitzman</u>, 193 Ill. 2d 560, 568 (2000), and <u>Esser v.</u>

<u>McIntyre</u>, 169 Ill. 2d 292, 297 (1996) ("Illinois has adopted the approach found in the Second

Restatement of Conflict of Laws").

Plaintiff's argument here fails on both waiver and misapplication grounds. First, as to

waiver, the record is clear that plaintiff never argued the concept of *depecage* in the trial court.

That is, she never insisted at any time below that the trial court should have examined the choice-

of-law question separately as to each particular defendant involved in her suit. To the contrary,

the evidence contained in the record demonstrates that plaintiff herself proceeded in this suit

against all defendants conjunctively, never separately. From the beginning, plaintiff alleged one

singular, indivisible injury--Larry's contraction of mesothelioma. She brought a tort action

asserting one theory on the case sounding in negligence against a combined 26 defendants,

claiming that these all had a duty to warn Larry about the asbestos to which they exposed him.

By the time plaintiff filed her sixth and final amended complaint, her assertions against 18 of the

20 remaining defendants were exactly the same. For each and every one of these defendants,

plaintiff claimed a collective exposure to asbestos during the years from 1966 (when Larry

became a pipe fitter) to 2005 (Larry's retirement). She did not separate out Larry's exposure to

each defendant's different product, even though the record was clear that Larry was not exposed

to the products of each defendant for the entire time between 1966 and 2005.[7] Also against each

_____

[7]For example, Larry testified he worked with Georgia-Pacific's product only sporadically from 1972 to 1976 on some side jobs.

23

and every one of these 18 defendants, plaintiff asserted two identical counts, one under the Wrongful Death Act and one under the Survival Act, each containing the same factual allegations. That is, for each of these defendants, plaintiff identically claimed in paragraph 8 of each count that they were negligent in: (a) their marketing of their products, (b) their failure to advise Larry of asbestos although they knew of the dangers, (c) their failure to provide instruction as to what apparel would be safe to wear during use of their products, (d) their failure to publish a safe plan for handling their products, (e) their failure to place adequate warnings on their containers, (f) their failure to develop alternative, nonasbestos-containing products in a timely manner, (g) their continued selling of known cancer-causing products, (h) their failure to inform users that asbestos-containing products caused cancer, (i) their failure to provide safe packaging, and (j) their negligent design of their asbestos-containing products. Moreover, in her posttrial motion to reconsider the trial court's decision to apply Indiana law, plaintiff argued that Larry was exposed to asbestos from all the defendants in the aggregate and this needed to be considered when determining choice-of-law.[8]

From all this, it is clear that plaintiff now presents a contradictory position on appeal, namely, that Larry's exposure to asbestos through Georgia-Pacific should be examined separately from his exposure to any other, or to all of the other, defendants. Her shift from asserting an analysis of choice-of-law upon an examination of the case as a whole to one upon an examination of the case as to Georgia-Pacific only is a new theory that cannot be raised for the

_____

[8]At this time, a majority of defendants were still parties to the suit, and plaintiff argued this while urging that the majority had more contacts with Illinois rather than Indiana.

24

first time on review, particularly since plaintiff had several opportunities to advance this theory before the trial court here. See Haudrich v. Howmedica, Inc., 169 Ill. 2d 525, 536 (1996) ("[i]t is well settled that issues not raised in the trial court are deemed waived and may not be raised for the first time on appeal"); see also In re Marriage of Schneider, 214 Ill. 2d 152, 172 (2005) ("the theory under which a case is tried in the trial court cannot be changed on review, and an issue not presented to or considered by the trial court cannot be raised for the first time on review"). That at this point in the litigation only two defendants remain (*i.e.*, Georgia-Pacific and Mobil) is of no moment; plaintiff chose to accept settlements from the other defendants. See McMath v. Katholi, 191 Ill. 2d 251, 255 (2000) (party waives right to complain of error where to do so is inconsistent with position taken by party in earlier proceeding, nor can party complain of error which party induced court to make or to which party consented). Therefore, we find plaintiff's *depecage* argument is waived.

Even if the argument were not waived, plaintiff's claim fails because it presents an incorrect application of *depecage*. As noted earlier, *depecage* involves the application of choice-of-law analysis to different issues in a cause of action. See Townsend, 227 Ill. 2d at 161. Accordingly, it is the issues presented in a case to which *depecage* applies, not the different defendants in a case. See Townsend, 227 Ill. 2d at 155, 161 (*depecage* is an "issue-oriented" approach which "begins by isolating the issue" in a case); Ruiz v. Blentech Corp., 89 F.3d 320, 324 (7th Cir. 1996); see also Restatement (Second) of Conflict of Laws § 145, Comment *d*, at 417 (1971) (noting that the analytical approach of *depecage* is that "[e]ach issue is to receive separate consideration" in determining choice of law (emphasis added)); Black's Law Dictionary

436 (6th ed. 1990) (defining *depecage* as process "whereby different *issues*" in a case are decided according to laws of different states (emphasis added)).

Plaintiff urges that the choice-of-law analysis in this case should occur once *depecage* is employed to separate out for consideration Larry's alleged exposure to Georgia-Pacific's product to the exclusion of all other alleged exposure from the multitude of other defendants plaintiff initially sued. As Georgia-Pacific notes, we find no precedent to support this use of *depecage*, that is, on a defendant-by-defendant basis. What is more, we believe such an application of *depecage* is contrary to, and would cause myriad problems in, our court system. At its essence, plaintiff's suit here was a multidefendant tort case asserting one singular injury to Larry. Though not directly addressing the process of *depecage*, several such cases that have come before our courts support the principle that "the entire litigation must be considered in assessing which forum has the more significant contacts with the litigation." Vickrey v. Caterpillar Tractor Co., 146 Ill. App. 3d 1023, 1027 (1986) (where court examined contacts of the decedent and both the manufacturer- and employer-defendants to determine conflict in laws for single injury case); see Wreglesworth v Arctco, Inc., 316 Ill. App. 3d 1023, 1031-32 (2000) (in single injury-accident case, court examined contacts of all involved, including the plaintiff, the driver, the owner and the manufacturers); Walters v. Maren Engineering Corp., 246 Ill. App. 3d 1084, 1090-91 (1993) (where the plaintiff was injured by a machine, the court examined the plaintiff's contacts to states involved, as well as those of all the defendants, including manufacturers, engineers and others); see, *e.g.*, Nichols v. G.D. Searle & Co., 282 Ill. App. 3d 781 (1996). Also, as Georgia-Pacific points out, applying different legal standards to each joint tortfeasor-defendant in a

multidefendant suit alleged to have caused a single injury could lead to inconsistent results.

The instant cause does not deal with different legal issues which are easily separable, such as a case involving a tort issue and a contract issue. Rather, it deals with multiple defendants all alleged by plaintiff to have done the same thing: owing Larry a duty to warn him about asbestos and being negligent in failing to do so, thereby causing his mesothelioma. Applying *depecage* to separate out each defendant in such a single-injury case is a misapplication of this process, which should focus on issues, not parties.

Ultimately, regardless of the claims surrounding *depecage*, it is our conclusion that the trial court properly granted Georgia-Pacific's motion requesting the application of Indiana law.

As we noted earlier, Illinois has adopted the approach found in the Restatement (Second) of Conflict of Laws when conducting a choice-of-law analysis in tort cases. See Barbara's Sales, 227 Ill. 2d at 61 (we no longer follow the traditional *lex loci delicti* approach, which focused only on the place of the wrong); Morris B. Chapman, 193 Ill. 2d at 568; see also Townsend, 227 Ill. 2d at 157-58 (describing history leading to adoption of current approach as set forth in Ingersoll v. Klein, 46 Ill. 2d 42 (1970)). This approach centers on "the broad principle that the rights and liabilities as to a particular issue are to be governed by the jurisdiction which retains the 'most significant relationship' to the occurrence and the parties." Barbara's Sales, 227 Ill. 2d at 61. Accordingly, this does not involve the mere counting of contacts but, rather, the recognition that other jurisdictions may have an interest in an issue that is "not adequately reflected by a simple tally." Barbara's Sales, 227 Ill. 2d at 61.

Section 6 of the Restatement (Second) of Conflict of Laws provides seven basic

principles for choice-of-law determinations, which include:

"(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relevant interests

of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied."

Restatement (Second) of Conflict of Laws § 6(2), at 10 (1971).

See also Barbara's Sales, 227 Ill. 2d at 62; Townsend, 227 Ill. 2d at 159.

To these guiding principles, we apply the concept of the "most significant relationship" formula to discern which state has the most significant relationship with the parties and the dispute. See Townsend, 227 Ill. 2d at 159-60 (this formula "describes the *objective* of that process" enunciated in section 6 (emphasis in original)); see also Barbara's Sales, 227 Ill. 2d at 62 (section 6 sets forth only general principles, to be supplemented by more specific rules found in subsequent sections). Section 145 "provides a list of the factual contacts or connecting factors that the forum court should consider in choosing the applicable law." Townsend, 227 Ill. 2d at 160. It states, in pertinent part:

"(2) Contacts to be taken into account in applying the principles of section

6 to determine the law applicable to an issue include:

28

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue." Restatement (Second) of Conflict of Laws § 145(2), at 414 (1971).

See also Townsend, 227 Ill. 2d at 160; see, *e.g.*, Barbara's Sales, 227 Ill. 2d 45 (beginning with section 6 and moving to section 145 to review choice-of-law analysis).

Regarding the first factor, we note that in personal injury tort cases such as the instant one, there is a presumption that the "the local law of the state where the injury occurred" is the choice of law that should govern. Restatement (Second) of Conflict of Laws § 146, at 430 (1971); see Townsend, 227 Ill. 2d at 164-65. However, there are situations in which the place of injury will not be an important contact, such as where the place of injury is "fortuitous or when for other reasons it bears little relation to the occurrence and the parties with respect to the particular issue, *** or when, *** [the] injury has occurred in two or more states." Restatement (Second) of Conflict of Laws § 145, Comment *e*, at 419 (1971). Here, unlike plaintiff, we are hard-pressed to state with certainty that this factor favors Illinois rather than Indiana. While it is true that Larry testified he used Georgia-Pacific's product while doing remodeling jobs in Illinois,

29

other evidence of record casts doubt on this. Larry's former wife, who was married to him at the time he claimed he did these jobs, as well as a coworker both testified that they never knew of Larry doing such work in addition to his welding work. Larry himself could not remember where in Illinois or when specifically he did these jobs, and admitted that his drywall work requiring joint compound on these projects was minimal. He also could not pinpoint on which jobs or when specifically he began to use Georgia-Pacific's joint compound, as opposed to that of other companies. Even if he did these jobs, they were sporadic side jobs possibly performed with Georgia-Pacific's product in a short span of four years during his entire working career. It cannot be ignored in such a single-injury case that Larry, as he himself admitted, was exposed to asbestos-laden products while working for a multitude of other employers, not even limited to those defendants named in this cause. Compared to the evidence regarding Georgia-Pacific's product, the evidence of Larry's primary work exposure was extensive and specific. And, as the list of his work contained in the record confirms, from 1966 to 2005, the vast majority of Larry's employers, jobsites and, accordingly, source of income, were in Indiana.

The second contact in section 145 is the place where the conduct causing the injury occurred. Generally, when an injury occurred in more than one state, or where the place of injury cannot be ascertained or is fortuitous and bears little relation to the occurrence and the parties, this second factor may be given particular weight. Restatement (Second) of Conflict of Laws § 145, Comment *e*, at 419 (1971). In the instant case, however, as with the first factor, it cannot clearly be said that either Illinois or Indiana is the place where the conduct occurred. In fact, both plaintiff and Georgia-Pacific concede the inapplicability of this factor in their briefs.

The third contact is domicile, residence, place of incorporation and place of business of the parties. "When the interest affected is a personal one," this factor is given greater importance. Restatement (Second) of Conflict of Laws § 145, Comment *e*, at 420 (1971). In addition, "[t]hese contacts are of importance in situations where injury occurs in two or more states." Restatement (Second) of Conflict of Laws § 145, Comment *e*, at 421 (1971). Here, Larry was a life-long resident of Indiana. His wife, who has pursued this suit individually and is Larry's representative, is also a resident of Indiana, as are Larry's children, who comprise his estate. Meanwhile, the places of incorporation and of business of the 26 defendants in this cause can be found all over the country, with Georgia-Pacific's in the state of Georgia.

Plaintiff and Georgia-Pacific agree that the fourth factor, examining the place where the parties' relationship is centered, does not play a role here since there was no relationship between Larry and any of the defendants, including Georgia-Pacific. Larry did not deal with Georgia-Pacific personally but, rather, bought the product from nonparty retailers he could not remember.

In sum, we consider the first and second factors a wash, as both the injury and the injury-causing conduct are alleged to have occurred in more than one state (Indiana and Illinois). The fourth factor is irrelevant, since there was no relationship between Larry and Georgia-Pacific or the other defendants. Therefore, this leaves the third factor of domicile which, although the defendants are spread all over the map, directly points to a strong contact with Indiana as Larry's life-long residence and that of his wife, his children and his estate (plaintiff).

From all this, then, it is our conclusion that Indiana, rather than Illinois, law applies here. However, as we discussed earlier, the "most significant relationship" test does not allow us to rest

with just a tally of these factors. See Townsend, 227 Ill. 2d at 169; Barbara's Sales, 227 Ill. 2d at 61. Rather, we must consider them in light of the general principles set forth in section 6 to see if those considerations overcome our conclusion that Indiana is the state with the most significant relationship. See Townsend, 227 Ill. 2d at 169-70; Barbara's Sales, 227 Ill. 2d at 62-65. Pursuant to our discussion below, we find that they do not.

As our state supreme court has recently noted, "[a] detailed analysis of all seven of the section 6 general principles is unnecessary" in a choice-of-law determination regarding a personal injury tort case. Townsend, 227 Ill. 2d at 169-70 (finding that subsections (a), (d), (f) and (g) of section 6(2) are not implicated in such cases). Rather, we are to concentrate on three subsections of section 6, namely, (b) the relevant policies of the forum, (c) the relevant policies of the other interested state and the relative interests of that state in the determination of the particular issue, and (e) the basic policies underlying the particular field of law. See Townsend, 227 Ill. 2d at 170.

The conflict at issue here centers on the differences between Indiana's and Illinois' statutes of repose. As we discussed earlier, the parties here recognize that Indiana's statute of repose applies to both negligence and strict product liability claims, while Illinois' statute of repose applies to only strict product liability claims. Essentially, then, the conflict here resides in the fact that plaintiff's negligence claim, as based on the record, will not be viable if Indiana law applied (thereby rendering no potential for compensation to her or the estate), but may potentially be viable if Illinois law applied (thereby opening an avenue for such recovery).

Our courts have held, for various reasons, that a state has an interest in compensating its

32

own domiciliaries for their injuries. See <u>Townsend</u>, 227 Ill. 2d at 171. This may be because the state of domicile is usually the state where the injury occurred (see Restatement (Second) of Conflict of Laws § 145, Comment *c*, at 416 (1971)) or because a state normally formulates its tort and compensation policies with its own particular domiciliaries in mind (see <u>Jones v. State Farm Mutual Automobile Insurance Co.</u>, 289 Ill. App. 3d 903, 918 (1997)) or because it is the state of domicile that most clearly feels the social and economic impact of an injured party's tort recovery (see <u>Miller v. Hayes</u>, 233 Ill. App. 3d 847, 852 (1992)) or because, when dealing with decedents, the state of domicile is the one concerned with the administration of estates, including the adequacy of compensation to the beneficiaries (see <u>In re Estate of Stewart</u>, 131 Ill. App. 2d 183, 186 (1971)). Larry was a life-long resident of Indiana. Plaintiff, his widow, resides there, as do his children, the beneficiaries of his estate. Moreover, from the evidence presented in this cause, Larry worked in Indiana for the vast majority of his career in, admittedly, several places of employment to which he was exposed to asbestos. In comparison, there is little evidence presented that Larry's injuries were at all tied to Illinois, a state in which neither he nor anyone involved in this case resided.

Regarding basic policies underlying tort law, plaintiff argues that the application of Indiana law here would foster a pro-business mentality and should be discarded in favor of Illinois law, which fosters a pro-plaintiff or pro-consumer mentality more applicable to the sentiments and matters of fairness involved in the instant cause. It is true that the purpose behind the tort rules of interested states are important factors to consider in a choice-of-law determination and that a state's interest in having its rule applied may depend upon the purpose

sought to be achieved by that rule. See Restatement (Second) of Conflict of Laws § 145, Comment *c*, at 416 (1971) (for example, if rule's purpose is to deter or punish misconduct, state where conduct occurred may be state of dominant interest, whereas if rule's purpose is to compensate victim, state where in jury occurred/ state of residence may have greater interest). However, the age-old adage applies, that a rule is a rule; a tort rule limiting liability for a personally injured plaintiff, hurt as he may be, is entitled to no more or less deference than one imposing liability upon a corporation that may have become wealthy from a product which caused the injury. See Townsend, 227 Ill. 2d at 171, quoting Malena v. Marriott International, Inc., 264 Neb. 759, 769, 651 N.W.2d 850, 858 (2002) (" 'tort rules which limit liability are entitled to the same consideration when determining choice-of-law issues as rules that impose liability' "). Moreover, characterizations such as "pro-consumer" or "pro-business" and arguments that choice-of-law determinations should be influenced by or based on these are not appropriate in our courts. See Townsend, 227 Ill. 2d at 171.

Having considered the policies and interests of Indiana and Illinois related to the instant cause, we cannot conclude that Illinois' relationship is so pivotal as to overcome the presumption that Indiana is the state with the most significant relationship. Therefore, we find no error in the trial court's choice-of-law determination pursuant to the Restatement (Second) of Conflict of Laws that Indiana, rather than Illinois, law is to apply here.

## CONCLUSION

Accordingly, for all the foregoing reasons, we affirm both the trial court's order granting summary judgment to Mobil and its order in favor of Georgia-Pacific finding that Indiana law

applies.

Affirmed.

GALLAGHER and O'MARA FROSSARD, JJ., concur.

No. 1-06-3597

Please use the following form

Stacey Gregory, Individually and as Special Administrator of the Estate of Larry Gregory, Deceased,

Plaintiff-Appellant,

v.

Beazer East, Bondex International, Exxon Mobil, Georgia-Pacific Corporation, and Union Carbide Corporation,

Defendants-Appellees

(A.W. Chesterton, BMI, a/k/a Blow Mix, Inc., Brand Insulation, Certainteed Corporation, Chicago Bridge and Iron, Commonwealth Edison, Foseco, Inc., Garlock Sealing Technologies, General Electric, Ingersoll Rand, John Crane, Inc., Lincoln Electric Corporation, Metropolitan Life Insurance Company, Pittsburgh Metals Purifying, a/k/a Treesdale, Inc., Reynolds Aluminum, Riley Stoker, Ryco, Inc., formerly Ryco Chemical, T.H. Agriculture and Nutrition, U.S. Steel Corporation, U.S.I. Chemical Company, f/k/a Northern Petrochemical, and Westinghouse Electric,

Defendants).

Docket No.

COURT
Opinion
Filed

No. ___1-06-3597___

Appellate Court of Illinois
First District, FIFTH Division

___July 3, 2008___
(Give month, day and year)

PRESIDING JUSTICE JAMES FITZGERALD SMITH DELIVERED THE OPINION OF THE COURT:

JUSTICES _____ GALLAGHER and O'MARA FROSSARD, JJ. ___ concur.

APPEAL from the
Circuit Court of
County; the Hon_____

Judge Presiding.

Lower Court and Trial Judge(s) in form indicated in margin:

Cook        Appeal from the Circuit Court of Cook County.

The Hon. **MARY A. MULHERN,** Judge presiding.

FOR APPELLANTS
John Doe, of Chicago
For APPELLEES, :

Indicate if attorney represents APPELLANTS or APPELLEES and include attorney's of counsel. Indicate the word r NONE if not represented.

APPELLANT: MICHAEL W. RATHSACK, Chicago, IL Nicholas J. Vogelzang and Michael W. Rathsack.

Smith and Smith of
Chicago,

APPELLEE GEORGIA-PACIFIC: HOLLAND & KNIGHT LLP, Chicago, IL Victor P. Henderson and Christopher W. Carmichael.

APPELLEE EXXON MOBIL: JOHNSON & BELL, LTD., Chicago, IL H. Patrick Morris and David F. Fanning; KING &

36

SPAULDING LLP, Houston, TX Reagan W. Simpson.