# Illinois Official Reports

## Appellate Court

***Lee v. Six Flags Theme Parks, Inc.*, 2014 IL App (1st) 130771**

| | |
|---|---|
| Appellate Court Caption | DONNA L. LEE, Personal Representative of the Estate of Thomas J. Lee, Deceased, Plaintiff-Appellant, v. SIX FLAGS THEME PARKS, INC., a Corporation, d/b/a Six Flags Great America, Defendant-Appellee (Royal Crane Service, Inc., a Corporation, Defendant). |
| District & No. | First District, Sixth Division<br>Docket No. 1-13-0771 |
| Filed | May 9, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Summary judgment was properly entered for defendant theme park in an action alleging wrongful death and survival claims based on construction negligence and premises liability arising from the fatal injuries suffered by plaintiff's decedent when he fell while dismantling a ride known as the "Splash Water Falls," since plaintiff failed to raise a genuine issue of material fact as to whether defendant was directly liable or vicariously liable based on contractual, supervisory or operational control over the project, and, furthermore, with respect to premises liability, there was no genuine issue of material fact as to whether defendant had actual or constructive knowledge of the conditions that led to decedent's fall. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-5824; the Hon. William E. Gomolinski, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Robert B. Pattison, of Law Offices of Robert B. Pattison, Ltd., of Chicago, for appellant. |
| | |
| | Richard J. Leamy, Jr., and Robert H. Fredian, both of Weidner & McAuliffe, Ltd., of Chicago, for appellee. |

| Panel | JUSTICE REYES delivered the judgment of the court, with opinion. Presiding Justice Rochford and Justice Lampkin concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff Donna L. Lee, personal representative of the estate of the late Thomas J. Lee, appeals orders of the circuit court of Cook County granting summary judgment in favor of defendant Six Flags Theme Parks, Inc. (Six Flags), on counts I, II, III and IV of plaintiff's complaint, which alleged wrongful death and survival claims based on theories of construction negligence and premises liability. Counts I and II were brought on behalf of the estate, while counts III and IV were brought as survival actions. On appeal, Donna argues Six Flags retained sufficient control over the work performed by its contractor to owe a duty of care to Thomas. Donna also argues there are genuine issues of material fact precluding the entry of summary judgment on her premises liability claims. For the following reasons, we affirm the judgment of the circuit court.

¶ 2                              BACKGROUND
¶ 3    On July 3, 2008, Donna filed a complaint against Six Flags and Royal Crane Service, Inc., in the circuit court of Cook County.[1] The complaint generally alleged that prior to March 11, 2008, Six Flags was engaged in the project of dismantling a steel structure known as the "Splash Water Falls" amusement ride (ride), using Campanella & Sons (Campanella) and Royal Crane as contractors. Thomas, employed by Campanella as a heavy equipment

_____
[1]Royal Crane is not a party to this appeal. The orders appealed from in this case also ruled upon issues in third-party actions that are not involved in this appeal.

mechanic, was assigned to assist in dismantling the ride by disconnecting and removing structural steel.[2]

¶ 4    On March 11, 2008 Thomas and coworkers had disconnected a motor on a platform 43 feet above ground. The motor was lifted from the platform and moved to the ground, resulting in a large opening in the platform, which was not covered or barricaded. Thomas and coworkers then were connecting cables from a crane to a component known as the pan, which was also 43 feet above ground. During this preparatory work, Thomas fell to his death, through the opening created by the removal of the motor from the platform.

¶ 5    Donna's complaint was comprised of four counts. Count I sounded in negligence on a premises liability theory, alleging Six Flags knew of the dangerous conditions on its land, but failed to exercise reasonable care to protect invitees, including Thomas. Count II sounded in construction negligence, alleging Six Flags retained sufficient control over the manner and method of the safety aspects of the project to incur liability for the negligence of Campanella and had actual knowledge the work would create the dangerous condition, yet failed to provide a safe place or platform upon which Thomas could work. Counts III and IV alleged survival actions based on the theories of premises liability and construction negligence, respectively. Counts II and IV, the construction negligence claims, also alleged Six Flags was negligent in hiring Campanella.

¶ 6    On January 11, 2013, following pretrial discovery, Six Flags filed a motion for summary judgment on the four counts of the complaint alleging construction negligence and premises liability with respect to Six Flags. On January 18, 2013, Six Flags filed an amended motion for summary judgment on these four counts of the complaint. In both motions, Six Flags argued it could not be liable because it did not retain any control over the means and methods of work on the project and was completely unaware of the hazard created shortly before Thomas's death.[3] On February 15, 2013, plaintiff filed her response in opposition to the motion for summary judgment, disputing both of Six Flags' primary assertions. Donna also responded to Six Flags' "brief assertion of a sole proximate cause defense," but neither party has raised such a defense as an issue in this appeal. On February 22, 2013, Six Flags filed its reply in support of its motion for summary judgment.

¶ 7    The materials submitted by the parties in support of and in opposition to summary judgment disclose the following facts. Six Flags and Campanella entered into a construction

---

[2]Although not described in the pleadings, the record establishes the ride consists of boats that were conveyed in a trough along an upward-sloping course to an elevated platform, from which the boats would, by the force of gravity, race through a downward-sloping trough of water to return to ground level. The record also establishes Campanella began dismantling the ride from the end, working backward and upward toward the platform at the top of the ride.

[3]The record does not indicate whether Six Flags obtained leave of court to file an amended motion for summary judgment. The amended motion for summary judgment is organized differently and some of its arguments are condensed in comparison to the original motion. We observe, however, that the arguments presented in both motions are substantially similar.

agreement (Agreement) dated January 31, 2008. Section 1.2 of the Agreement stated the contract documents would include not only the Agreement, but also the specifications of the work and other documents, among which were the proposal from Campanella, an appendix of general conditions, the "Six Flags Great America Contractor Safety Guidelines" (Safety Guidelines), an indemnity and insurance addendum, and supplemental schedules. Section 1.3 of the Agreement provided for Campanella to have conducted a thorough inspection of the work site to determine the difficulties and hazards incident to the work before executing the Agreement or commencing work on the project.

¶ 8      Section 3.1 of the Agreement provided Campanella shall supervise and direct the work on the project. Section 3.1 also provided Campanella "shall be solely responsible and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under this Agreement." Section 3.2 provided that, unless otherwise specified, Campanella shall provide and pay for all labor, materials, equipment, and other facilities and services necessary for the proper execution and completion of the work. Section 3.6 of the Agreement required Campanella to defend, indemnify and hold Six Flags harmless, to the fullest extent permitted by law, against all claims and causes of actions by any party–including Campanella's employees–arising out of negligence by Campanella and its employees.

¶ 9      The Safety Guidelines, signed by Campanella's president on February 11, 2008, state:

> "Safety and the safety training is the responsibility of the contractor for all its operations. Full compliance with all Federal, state and local laws and guidelines are required. This also includes providing personal protective equipment as the job dictates or requires. If Six Flags *** is required to provide personal protective or other safety equipment to aid in compliance, it reserves the right to do so at the expense of the contractor."

In particular, the contractor was required to comply with federal Occupational Safety and Health Administration (OSHA) standards regarding communications regarding possible exposure of employees to hazardous materials, OSHA guidelines for the control of hazardous energy, the OSHA program for entries into confined spaces, and OSHA requirements for the proper barricading and warning of open holes.

¶ 10      The Safety Guidelines also provided that "[c]ontractors doing work above six feet will provide for and enforce the use of fall protection for their employees. The contractor was also responsible for the handling, storage and disposal of any hazardous waste in accordance with the law. Contractors were required to use ground fault protected receptacles for all temporary power needs. Moreover, the contractor was required to obey all posted traffic control signs on Six Flags' property. Six Flags disclaimed responsibility for the contractor's equipment. If the contractor worked with flammable materials or welding equipment, the contractor was required to provide proper fire extinguishing media and notify Six Flags when and where welding was to occur.

¶ 11      The Safety Guidelines further provided Six Flags' management could "inspect for any unsafe action and/or conditions and request corrections of such situations." Consumption of alcohol and illegal substances on or before entering Six Flags' property was prohibited, as

were practical jokes, horseplay, scuffling and fighting. Firearms were also barred from Six Flags' property.

¶ 12     The general conditions similarly required the contractor to comply with OSHA law and to provide protection for the work in place. The general conditions barred burning of materials at the work site. Six Flags had the right to approve any substitute equipment or materials for those specified in the underlying contract. The contractor was also required to have a competent superintendent, foreman or other representative satisfactory to Six Flags at the work site at all times. The contractor was required to submit a written notice to Six Flags for permission to proceed. Furthermore, if the contractor neglected to properly execute the work, Six Flags could, after three days' notice to the contractor, make good such deficiencies and deduct the cost thereof from the payment due the contractor.

¶ 13     The indemnity and insurance addendum, also signed by Campanella's president on February 11, 2008, provided Six Flags had no right to control the details of the contractor's work, or the means, methods or manner of the contractor's performance of the work under the Agreement. Six Flags had the right to determine the results to be accomplished under the contract, as well as the right to accept or reject the results and quality of the contractor's work.

¶ 14     Schedule A to the Agreement required that all materials conform to the City Of Gurnee building codes, and all workmanship to meet the approval of Six Flags' construction division. The contractor was required to submit daily progress reports. All employees were required to conform to Six Flags policies, specifically the safety policies. The "Schedule 'A' Supplemental" required the contractor to remove debris resulting from the operation on a daily basis. All workers on the site were required to wear a hard hat for protection. The contractor was further required to submit a daily report to the Six Flags construction office, setting forth the number of foremen and mechanics working that day, as well as the location and nature of the work performed.

¶ 15     On February 12, 2008, Pete Campanella, Jr. (Pete), signed an acknowledgment that he read and understood the Six Flags Great America contractor safety, health and security requirements (Great America Requirements), and agreed to convey them to Campanella's employees on the project. Many of the Great America Requirements were substantively similar to the Safety Guidelines. In addition, the Great America Requirements provided that, prior to commencing any work, a contractor representative must attend a health and safety orientation conducted by the Six Flags Great America safety department. The contractor representative must bring a written scope of work, along with a list of materials to be used, to the orientation. The contractor representative also must review the policies and procedures with all contractor employees prior to commencement of the work. All contractor employees would be required to attend a safety briefing at least weekly thereafter. Six Flags Great America would discuss any safety concerns at these meetings and field questions from contractor employees. The contractor would report all injuries and incidents to the Six Flags Great America safety department for investigation.

¶ 16     The Great America Requirements further provided the contractor must make available an OSHA-required safety and health program, including a statement of policy, plan for work site hazard prevention and control, and training for employees. The contractor was responsible for

personal protection equipment, including hard hats, steel toe safety shoes, shirts and long pants, and–when needed–safety glasses, hearing protection, and safety vests. OSHA-approved fall protection must be worn in all areas where employees were working at unprotected heights of six feet or more.

¶ 17　　In addition, the Great America Requirements addressed personnel movement. The contractor's drivers were required to have driver's licenses and observe posted speed limits on Six Flags Great America property. When it was necessary to transport contractor employees in the back of a truck, all employees were required to be seated with the tailgate raised. All contractor vehicles were subject to search while on Six Flags Great America property.

¶ 18　　Pursuant to the Great America Requirements, the contractor was required to conduct a daily inspection to insure compliance with its own procedures, as well as those of Six Flags Great America, and applicable laws. Six Flags Great America would also inspect the work site. If a representative of Six Flags Great America observed a safety violation, the contractor would be requested to correct it. If a contractor employee was notified in writing of three safety violations, the employee would no longer be allowed to work on the property. Any contractor employee committing theft, trespassing or destruction of property would also be removed from the property.

¶ 19　　Steven Small testified by deposition that on March 11, 2008, he was Six Flags Great America's safety manager. Small described the Splash Water Falls amusement ride as having cars or boats ascending a ramp to a height of 43 feet, then across a level area and then proceeding down a chute. According to Small, when maintenance personnel would work on the top level of the ride, they would have personal protective equipment, such as harnesses, lanyards or retractable equipment, provided by Six Flags Great America to guard against a fall.

¶ 20　　Small identified maintenance director Gary Pohlman as the individual who approved the contract with Campanella to dismantle the Splash Water Falls amusement ride. Small distinguished the process of dismantling the ride piece-by-piece from a demolition, which may involve exploding or pulling down a structure. Small also testified construction superintendent Terry Pearsall,[4] who reported to Pohlman, gathered information to develop the contract and the scope of the work, directed the contractors to the work site, and to monitor the progress of the work. According to Small, Pearsall was at the park every day, but Small did not know how often Pearsall visited the work site. At some point after Thomas fell, Small proceeded to the top of the ride, where he observed a lanyard rope on the railing. Small never assessed whether that lanyard rope was long enough to allow someone attached to the rope to reach all the way to the other side of the platform at the top of the ride. On the date Thomas died, Pearsall told Small he had observed Campanella employees tied off with a lanyard rope on at least one prior occasion.

¶ 21　　According to Small, Pearsall arranged the meeting between Small and Pete to discuss the scope of the work and the contractor's safety responsibilities. At this meeting, Small informed Pete of the requirement for fall protection. Small testified the requirement for fall protection above a six-foot height was an OSHA regulation. Small informed Pete the contractor would be

---

[4]The record indicates Pearsall's full name is Ira Edward Pearsall.

required to follow Campanella's safety policy, as well as OSHA regulations and "the line item in our paperwork" for fall protection. Small also testified he did not know what methods Campanella planned to use, but recalled Pete informing him they had harnesses and lanyards and knew the standards. Small received a copy of Campanella's general safety policies and discussed them with Pete. Small did not discuss with Pete the use of retractable equipment of the type previously described in his deposition. During the meeting, Small reiterated Campanella was solely responsible for the safety of the work, including the fall-protection requirements.[5]

¶ 22    Small further testified Campanella was not required to submit a daily work report, describing it as a standard, but not a routine, practice which was enforced. Small had no other meetings with anyone from Campanella before the incident involving Thomas. Small indicated he drove past the work site on one occasion, but did not observe anyone working on the ride or speak to any Campanella employees at that time. Small indicated Six Flags could stop work to correct an unsafe condition at the work site.

¶ 23    In addition, Small testified he proceeded to the work site after learning of Thomas's accident through a radio call. When he arrived at the scene, he observed Thomas was wearing a harness. Small gathered Campanella employees and brought them to a conference room to obtain statements about the incident. Small recalled one of the employees, Mark Kuenster, stating he had reminded Thomas to be careful about the opening just before the accident occurred.

¶ 24    Pohlman testified by discovery deposition regarding the methods, equipment and training for fall protection provided to Six Flags' ride maintenance employees. Pohlman also testified contractors were required to follow fall-protection regulations at heights above six feet, and he would stop someone violating those regulations. Pohlman also testified that if he or Pearsall observed contractors not complying with the general conditions of the contract, he could terminate the job.

¶ 25    Pohlman acknowledged he was the individual who primarily interacted with contractors regarding the removal of the Splash Water Falls amusement ride, although it was a corporate contract. Pohlman was designated as the owner's representative for the project. According to Pohlman, Campanella had previously performed grading, sewer work, excavation and demolition work For Six Flags. In particular, Campanella previously removed a station for an attraction named "Shockwave," which included a 20-foot platform.

¶ 26    Pohlman also testified he knew the gear box would need to be removed by crane. Pohlman assumed the workers would use fall protection if a hole was created on the platform. Pohlman did not specifically discuss the use of fall protection on the platform with Pete. Pohlman also did not have conversations with Pete about how the structure of the Splash Water Falls amusement ride would be removed.

---

[5]In her brief's statement of facts, Donna cites Small's deposition to assert that Small approved the use of a single-lanyard fall protection device, but the cited portion of Small's deposition does not support that assertion.

¶ 27    Pohlman visited the work site "from time to time" to check on the progress of the project. His office was perhaps 600 feet from the jobsite and he probably would have driven to the site in February and March. Pohlman did not speak to Campanella's workers about the tasks they performed and never observed anything amiss or unsatisfactory to cause him to request the work be performed in a different manner.

¶ 28    Although Pohlman had observed workers at the top of the structure, he did not recall the last time he visited the site prior to Thomas's fall. Pohlman was on the other side of the park with Pearsall when they learned Thomas had fallen. Pohlman was not involved in the investigation of the incident. Pohlman never conversed with Pete about the incident.

¶ 29    Pearsall, Six Flags Great America's construction manager, testified by discovery deposition regarding Campanella's prior work as a contractor for Six Flags. Typically, Pearsall would check whether contractors were complying with fall-protection requirements. If Pearsall observed someone not complying with fall-protection requirements, he would quickly instruct the worker to use a harness, descend from the height, or take whatever action was necessary to make the work safe. Pearsall agreed that if a worker did not comply with his direction, he "would be out of there."

¶ 30    Pearsall contacted Pete regarding the project prior to bidding and showed him the site for approximately 5 to 10 minutes. Pearsall did not recall ascending to the top of the structure on this visit or discussing the removal of the gear box with Pete. Pearsall also did not recall whether Campanella independently evaluated the site or ascended to the top of the ride prior to commencement of the work. Moreover, Pearsall did not recall soliciting bids from anyone other than Campanella.

¶ 31    Pearsall was not involved in the meeting between Pete or any other Campanella personnel and safety manager Small. Pearsall was not aware of any other safety meetings between Six Flags and Campanella personnel. Although Six Flags required contractors to submit forms regarding weekly safety talks, Pearsall did not know whether Campanella submitted the forms regarding this project. In addition, Pearsall testified no one really asked for the daily work reports required by the contractor.

¶ 32    Pearsall knew Thomas from Campanella's prior work and had no criticism pertaining to his diligence. Pearsall, however, never conversed with Thomas regarding this project. Pearsall had no knowledge of Thomas's work duties on the project.

¶ 33    According to Pearsall, on this particular project, Campanella was removing successively higher steel components of the ride's chute. Pearsall did not recall seeing workers actually on the chute structure itself, as opposed to being in a lift. Pearsall visited the work site two or three times weekly. He normally would not visit a demolition site on a daily basis. Pearsall spent most of his time with the construction of an attraction called the "Dark Knight," which was located in a different area of the park.

¶ 34    Based on his prior experience, Pearsall knew that removal of the gear box would leave a hole in the platform at the top of the structure. Pearsall did not recall having any conversations with Campanella personnel to plan what would happen after the gear box was removed. Pearsall did not know when the gear box was to be removed. Although Pearsall observed

Campanella workers using fall protection, he did not recall having any conversations with Campanella personnel regarding fall protection. Pearsall did not know who, if anyone, from Six Flags was monitoring Campanella's work for compliance with the fall protection requirements.

¶ 35    According to Pearsall, his conversations with Campanella workers would be "small talk" about the progress of the work. Pearsall did not recall Campanella workers mentioning any problems to him. Pearsall did not provide suggestions or instructions to Campanella's workers.

¶ 36    Pearsall confirmed he and Pohlman were on the other side of the park when they heard about Thomas falling from the structure and immediately proceeded to the work site. Pearsall, however, was not involved in the investigation of the incident. Pearsall's job duties and responsibilities were not involved with contractual matters, although he was generally familiar with the contents of the contracts. Pearsall testified that aside from the daily work reports, contractors were expected to comply with the terms of the contract.

¶ 37    Pete, a vice-president of Campanella, testified by discovery deposition that Campanella had worked for Six Flags on more than 20 occasions prior to the incident. Pete agreed with the recital in the Agreement that Campanella had skill and expertise in the renovation and construction of facilities used in theme parks and other amusement facilities. Prior to this incident, Campanella had never been found not to be competent to perform the type of demolition Campanella was performing by OSHA or any other regulatory agency or judicial body. Campanella's previous demolition work included the removal of a silo at the Gurnee Mills shopping center, which involved cutting the structure apart at a height above 20 feet using a lift truck.

¶ 38    Pete acknowledged the Agreement made Campanella solely responsible for the means, methods, techniques and procedures for coordinating the work on the project. Pete agreed that, in practice, Six Flags hired Campanella to dismantle and remove the ride, but left the means and methods of accomplishing this to Campanella. Pete also acknowledged Campanella agreed to be responsible for the safety of its employees on this particular job. According to Pete, the Great America Requirements did not contain safety guidelines that differed from his own safety standards. There was nothing in the Six Flags safety requirements that changed how Campanella performed its work or altered the means or methods by which Campanella accomplished its work. Pete testified Six Flags exercised no control over the operational details of this job. Campanella required and supplied safety harnesses for its employees working at heights.[6]

¶ 39    Pete further testified he delegates the fulfillment of Campanella's contracts to other Campanella personnel. Kevin Zupec was the on-site job supervisor for Campanella. When Zupec was not present, Thomas would act as the job supervisor. Pete added Thomas wanted to take the lead role on this job.

¶ 40    Pete testified he, Zupec and Thomas met with Pearsall and Pohlman approximately two weeks prior to the bid date for the project to examine the site, discuss what Six Flags wanted them to accomplish, and establish the bid date. Pearsall provided the Campanella personnel

_____

[6]Pete did not specify in his testimony the height at which harnesses would be required and supplied.

with access to the site and allowed them to take measurements. Pearsall did not direct or suggest the manner in which he wanted them to dismantle the structure. The Campanella personnel ascended to the top of the Splash Water Falls ride, but Pete did not recall whether Pearsall accompanied them. Pete also did not recall whether they discussed how the gear box would be removed. Pete knew the removal of the gearbox would leave a hole in the platform at the top of the ride, but did not recall whether the issue was specifically discussed at the time.

¶ 41 Moreover, Pete testified regarding the meeting with Small, the purpose of which was to ensure Campanella would abide by Six Flags' safety policies. Pete signed off on the documentation of the safety policies at this meeting. Pete did not recall discussing fall protection during the meeting.

¶ 42 Pete identified a set of documents as Campanella's daily work reports for the project, which were used to keep track of the employees present at the site and the work performed. According to Pete, Six Flags did not require him to submit a daily work report to Six Flags' personnel. Pete nevertheless prepared and retained reports for the period from February 18 through March 10, 2008. Pete testified he would not have prepared these reports had Small not required their preparation.

¶ 43 Pete additionally testified Pohlman would observe the site periodically to monitor the progress of the work. Pete could not say whether Pohlman and Pearsall observed the site daily. Pete, however, acknowledged he provided answers to written interrogatories stating Pohlman and Pearsall visited the site daily. Pete also testified he was not at the work site daily, but knew from past experience Pohlman and Pearsall would visit daily.

¶ 44 Pete added that, regarding the accomplishment of the work, Six Flags would attempt to accommodate Campanella employees' reasonable requests. If Pohlman and Pearsall observed an unsafe act, they would definitely say something about it. If Pohlman and Pearsall wanted an unsafe act stopped, Campanella would stop.

¶ 45 Pete could not recall the number of times he observed Pohlman and Pearsall at the site prior to Thomas's fall. Pete was not at the scene of the incident on the date Thomas fell. Pete became aware that Thomas removed his safety harness shortly before the fall. Pete did not know why Thomas would have removed his harness. Pete claimed, based on his conversations with Thomas, that Thomas had experience working above 20 feet at his previous employment. Pete testified Kuenster was Campanella's operator on the job. Pete did not know whether Kuenster had experience working at heights over 20 feet.

¶ 46 Zupec, an equipment manager for Campanella, testified by deposition he had not supervised jobs involving high structural steel prior to the job at Gurnee Mills. Zupec's duties on the Gurnee Mills job did not require fall-protection devices. Zupec believed Thomas worked "on and off" on the Gurnee Mills project. In Zupec's opinion, Thomas was more experienced than he was in bringing down structural steel. Zupec described Thomas as one of Campanella's best employees and a very safe worker.

¶ 47 Zupec, after describing various projects Campanella performed for Six Flags, testified that in general, Pearsall would be present daily to ensure Campanella was working. From time to time, Pearsall would comment on the work and Campanella listened to his comments.

¶ 48    According to Zupec, Campanella had harnesses and lanyards available prior to this project. Zupec added he was almost certain Campanella purchased two new harnesses and two new lanyards for this project. The harnesses do not prevent falls, but slow a worker's fall such that they control and cushion a fall. Campanella provided this type of harness to Thomas and Kuenster when they were required to ascend the elevated structures of the Splash Water Falls ride.

¶ 49    When Zupec, Pete and Thomas met Pearsall prior to bidding the job, Pete and Pearsall remained at ground level, while Zupec and Thomas ascended a stairway on the ride and discussed whether they wanted to accept the work. According to Zupec, he and Thomas discussed the challenge of the project, which was disassembling, rather than repairing, the ride. Zupec and Thomas discussed the different approaches they might take to bring down the structure. Zupec testified he and Thomas may have been on the structure for as long as 30 minutes of the 2 hours they spent at the site that day. After returning to ground level, Zupec learned Six Flags was going to want to save the gear box.

¶ 50    At this time, Zupec did not discuss the manner of dismantling the ride, or fall protection, with Pearsall. Zupec ultimately learned Six Flags wanted to save certain buildings at the site, which rendered it impossible to simply knock over the structure. Before the work commenced, Small made a comment that Campanella should ensure they had fall protection while working at the top of the structure. At that meeting, Zupec was unsure whether the platform and gear box would be removed together, or whether the gear box would be removed prior to removing the platform. Zupec and Thomas later discussed removing the entire platform versus removing the gear box approximately one week before the gear box was ultimately removed. Zupec ultimately was aware removing the gear box would create a hole in the platform, but he did not recall discussing that fact with Thomas or any Six Flags personnel.

¶ 51    Zupec testified he was the supervisor for the job. Zupec was at the work site for the first two full days of the project, but was "in and out" supervising jobs and making repairs on other days. Zupec did not recall any particular conversations with Pearsall while at the work site. Zupec also did not recall any conversation with Pohlman about the job after work commenced. Zupec further did not think Pohlman contacted any other Campanella personnel after work commenced, because he would have learned of such contact. According to Zupec, the only supervision given to Campanella employees on the project was provided by Zupec or Thomas when Zupec was not present. Zupec gave "toolbox talks" to the crew every morning, including reminders about fall protection and demonstrations of how to properly wear harnesses and how to get tied off.

¶ 52    Zupec did not know whether Pearsall or Pohlman visited the work site daily. Zupec assumed Pearsall and Pohlman had the authority to inspect the site for safety conditions. Zupec also assumed that if Pearsall or Pohlman observed a safety violation they would request that he correct the problem. Zupec and Pete performed safety inspections at the work site.

¶ 53    Zupec additionally testified he did not recall whether Six Flags' safety rules were ever discussed with the crew Campanella assigned to this project. Zupec recalled that safety rules were discussed, but "most of them were discussed from Campanella's safety." Zupec testified Campanella's own standards required their workers to wear hard hats and orange safety vests.

Zupec did not know whether Six Flags required hard hats or orange safety vests. Zupec was not required to submit a daily work report. Zupec opined that had Six Flags made a point-to-point or retractable spool type of fall protection available, Campanella would have considered using it.

¶ 54     According to Zupec, Thomas never informed him of any safety concerns regarding the project, including concerns about working at heights. Zupec testified that to his knowledge, Thomas and Kuenster used harnesses every day and were tied off while working at heights on this job. Zupec recalled being at the work site at approximately 3 or 4 p.m. the day before Thomas fell, because Zupec was leaving town later that day. Zupec made the visit to assess the progress of the project with Thomas. According to Zupec, Campanella's personnel would have finished the highest portion of the work in another day.

¶ 55     Zupec returned to the site on the day following the incident for a meeting attended by Pete, Campanella's president, an OSHA inspector and Six Flags personnel. Zupec did not believe Pearsall attended this meeting, and he could not recall whether Pohlman or Small attended the meeting. The OSHA inspector inquired about fall-protection measures at the site and requested to examine the harnesses. According to Zupec, Campanella retained another construction company to complete the project.

¶ 56     Kuenster testified by deposition regarding the nature of the work on the project. According to Kuenster, he and Thomas were the only Campanella workers who performed torch cutting at heights on this project. Kuenster confirmed Thomas was acting foreman on the date of the incident. Kuenster also testified it was necessary for him and Thomas to unhook their six-foot lanyards in order to navigate the entirety of the platform at the top of the structure.

¶ 57     Tony Wyatt testified by deposition he was a crane operator for Royal Crane on the date of the incident. Wyatt observed Thomas climb out of the portion of the ride identified as the pan and step onto the platform at the top of the ride. Wyatt then observed Thomas attempt to cross the platform, walking toward a handrail. Thomas appeared to be prevented from reaching the handrail because his harness was tied off. Wyatt further observed Thomas walk back toward the pan, where he appeared to disconnect his harness from the lanyard. Shortly thereafter, it appeared to Wyatt that Thomas's left foot went into an opening, causing Thomas to lose his balance. According to Wyatt, Thomas fell backward and grabbed a beam underneath the opening, but ultimately fell to the ground.

¶ 58     Frank Burg, the president of a health and safety consulting firm, testified by deposition that he decided to consult on this case because Six Flags did not: make certain there were specific rules for fall protection; ensure the rules were followed; or, as far as Burg knew, take action when safety rules were not followed. Rather, Six Flags "just tried to delegate the responsibility away with some legal document and then walk away from their responsibility." Burg did not agree that Six Flags had no responsibility to perform any of the work in dismantling the ride. Burg opined Six Flags had the responsibility to ensure there was a fall-protection plan and a proper safety plan and to coordinate the interaction between Campanella and Royal Crane. Burg further opined Six Flags breached its duty to determine whether Campanella was capable of performing the work. In Burg's opinion, Campanella was not competent to perform the

work because the firm lacked a fall-protection plan and adequate fall-protection equipment for this project. Burg opined Thomas was an employee of Six Flags:

> "Because if you don't hold those controlling employers responsible for safety, then no one will be responsible for safety. They'll get lawyers to write subcontracts to put the responsibility on people that have no control, and then people will get killed more and more, and we can't have that, can we, sir?"

Burg also opined Thomas was a Six Flags employee because the contract was subject to OSHA's multiemployer work site policy. Burg acknowledged that Six Flags allowed, but did not approve, the use of the lanyards and harnesses on this project. Burg heard that his opinions in other cases were rejected by two Indiana courts and one Illinois court on the basis he was attempting to interpret the law.

¶ 59 On March 1, 2013, the circuit entered an order which in relevant part granted Six Flags' motion for summary judgment as to the construction negligence and premises liability claims in counts I, II, III, and IV, as alleged against Six Flags. The order specified, however, that Donna's claims for negligent hiring in counts II and IV could proceed against Six Flags. The order further found there was no just reason to delay enforcement or appeal of the entry of summary judgment. On March 7, 2013, the circuit court entered an amended order which was nonetheless substantially similar regarding the entry of summary judgment and the survival of the negligent hiring claims. Also on March 7, 2013, Donna filed a motion to voluntarily dismiss her negligent hiring claims against Six Flags, which the trial court granted on the same day. Donna filed a timely notice of appeal to this court on March 7, 2013.

¶ 60                                                    ANALYSIS

¶ 61 On appeal, Donna argues the circuit court erred in granting summary judgment to Six Flags. Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2010). The purpose of summary judgment is not to try a question of fact, but to determine whether a genuine issue of material fact exists. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004). In determining whether a question of material fact exists, "a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent." *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). Summary judgment is "a drastic means of disposing of litigation" and should only be awarded when the moving party's right to judgment as a matter of law is "clear and free from doubt." *Id*. On the other hand, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999).

¶ 62 We review grants of summary judgment *de novo*. *Williams*, 228 Ill. 2d at 417. Accordingly, the reviewing court "must independently examine the evidence presented in support of and in opposition to a motion for summary judgment" to determine whether a genuine issue of material fact exists. *Groce v. South Chicago Community Hospital*, 282 Ill. App. 3d 1004, 1006

(1996). Given this court's independent review, " 'we may affirm the trial court's grant of summary judgment for any reason that is supported by the record, regardless of whether that reason formed the basis for the trial court's judgment.' " *Hess v. Flores*, 408 Ill. App. 3d 631, 636 (2011) (quoting *Bovan v. American Family Life Insurance Co.*, 386 Ill. App. 3d 933, 938 (2008)).

¶ 63 In particular, Donna argues the circuit court erred in granting summary judgment on the construction negligence claims in counts II and IV of her complaint, contending material questions of fact remain regarding whether Six Flags retained sufficient control over the project to be vicariously or directly liable for the incident. The construction negligence theory is governed by section 414 of the Restatement. See Restatement (Second) of Torts § 414 (1965); *Wilkerson v. Paul H. Schwendener, Inc.*, 379 Ill. App. 3d 491, 493 (2008). Donna also argues the circuit court erred in granting summary judgment on the premises liability claims in counts I and III of her complaint, contending there is a genuine issue of material fact regarding Six Flags' notice of conditions at the work site. The premises liability theory is governed by section 343 of the Restatement. See Restatement (Second) of Torts § 343 (1965); *Wilkerson*, 379 Ill. App. 3d at 493. We address these arguments in turn.

¶ 64                                        Construction Negligence

¶ 65 Donna's theories of recovery are grounded in common-law negligence. "The essential elements of a cause of action based on common-law negligence are the existence of a duty owed by the defendant to the plaintiff, the breach of that duty, and the injury proximately caused by that breach." *Cochran v. George Sollitt Construction Co.*, 358 Ill. App. 3d 865, 873 (2005) (citing *Ward v. K mart Corp.*, 136 Ill. 2d 132, 140 (1990)). Donna's arguments focus on the existence of a duty.

¶ 66 "As a general rule, one who employs an independent contractor is not liable for the acts or omissions of the independent contractor." *Wilkerson*, 379 Ill. App. 3d at 493; see *Joyce v. Mastri*, 371 Ill. App. 3d 64, 73 (2007). In *Larson v. Commonwealth Edison Co.*, 33 Ill. 2d 316, 325 (1965), however, our supreme court first recognized Restatement section 414 as an expression of Illinois common-law negligence principles. Section 414 provides an exception to the general rule, referred to as the "retained control" exception. *Cochran*, 358 Ill. App. 3d at 873-74. Section 414 provides:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." Restatement (Second) of Torts § 414 (1965).

"The comments accompanying section 414 'describe a continuum of control' and provide some illumination as to the necessary degree of control a defendant must exercise to be subject to liability under this section." *Calderon v. Residential Homes of America, Inc.*, 381 Ill. App. 3d 333, 341 (2008) (quoting *Martens v. MCL Construction Corp.*, 347 Ill. App. 3d 303, 314 (2004)).

¶ 67    Comment *a* to section 414 explains:

> "If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others." Restatement (Second) of Torts § 414 cmt. a (1965).

"Comment *a* thus distinguishes between vicarious and direct liability." *Calderon*, 381 Ill. App. 3d at 341 (citing *Cochran*, 358 Ill. App. 3d at 874).

¶ 68    "Comment *b* provides further illumination on the theory of direct liability described in Comment *a*." *Calderon*, 381 Ill. App. 3d at 341. Comment *b* to section 414 states:

> "The rule stated in this Section is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself. So too, he is subject to liability if he knows or should know that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control cause the subcontractor to do so." Restatement (Second) of Torts § 414 cmt. b (1965).

¶ 69    Comment *c*, on the other hand, describes the necessary degree of retained control a general contractor must exercise to be subject to vicarious liability, limiting the scope of the "retained control" exception. See *Calderon*, 381 Ill. App. 3d at 342. Comment *c* states:

> "In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Restatement (Second) of Torts § 414 cmt. c (1965).

- 15 -

Thus, "the general contractor, by retaining control over the operative details of its subcontractor's work, may become vicariously liable for the subcontractor's negligence; alternatively, even in the absence of such control, the general contractor may be directly liable for not exercising his supervisory control with reasonable care." *Cochran*, 358 Ill. App. 3d at 874. Yet this court has held that "even where the employer or general contractor retains the right to inspect the work done, orders changes to the specifications and plans, and ensures that safety precautions are observed and the work is done in a safe manner, no liability will be imposed on the employer or general contractor unless the evidence shows the employer or general contractor retained control over the 'incidental aspects' of the independent contractor's work." *Rangel v. Brookhaven Constructors, Inc.*, 307 Ill. App. 3d 835, 839 (1999) (citing *Fris v. Personal Products Co.*, 255 Ill. App. 3d 916, 924 (1994)); see *Downs v. Steel & Craft Builders, Inc.*, 358 Ill. App. 3d 201, 206 (2005).

¶ 70 For example, in *Gregory v. Beazer East*, 384 Ill. App. 3d 178, 179-80 (2008), the plaintiff sued Exxon Mobil (Mobil) individually and on behalf of her husband, Larry, alleging negligence in connection with her husband's contraction of mesothelioma and subsequent death. Larry performed hot welding inside and outside of pipes for a subcontractor during the construction of a Mobil refinery in Joliet, Illinois. *Id*. at 180-81. To protect against the heat from the pipes, Larry used blankets and gloves containing asbestos, which were supplied by the contractor. *Id*. at 181. Larry returned to do periodic jobs at the refinery in the 1970s, 1980s and 1990s in different capacities and for different contractors. *Id*. at 182. Larry also worked for other employers at several different jobsites where he was exposed to asbestos. *Id*. Larry was subsequently diagnosed with mesothelioma attributed to asbestos exposure; in 2005, he brought a negligence suit against, among others, Mobil, due to the time he spent working at the Joliet refinery. *Id*. The trial court granted summary judgment to Mobil, ruling in part there was no evidence that Mobil controlled the means or methods by which Larry performed his work on Mobil's premises. *Id*. at 182-83.

¶ 71 On appeal, this court affirmed, reasoning:

"In the instant case, it is clear that Mobil did not retain the degree of control necessary to impose liability upon it. Larry testified that during his initial work at the refinery in 1970-71, he worked directly for Petroleum Piping, which had been subcontracted to do the welding work by CBI (the general contractor of the welding portion of the project), which, in turn, had been hired by Fluor (the general contractor of the whole project), which had been hired by Mobil. Larry further testified that he was one of eight pipe fitters who were supervised on a daily basis by CBI, which provided an inspector on the project, and Larry received all his tools and instructions for his work from Petroleum Piping. Larry made clear for the record that Mobil did not provide any direction or supervision of his welding tasks regarding the project and that he, indeed, did not look to Mobil for this. Larry stated later that this was also true for his subsequent work projects at the refinery in the 1980s and 1990s, where he worked directly for several contractors such as Hunter and BMW, but never directly with Mobil. Most specifically, Larry confirmed that Mobil did not provide him with the

asbestos blankets or gloves, nor directed or ordered him to use them; these were supplied by CBI.

In addition to this evidence, former Mobil refinery manager D'Ambrisi testified that general contractor Fluor, not Mobil, supervised the Joliet work site and had 'total responsibility for the construction of the refinery,' including, specifically, selecting the subcontractors, such as CBI and Petroleum Piping, and managing their work. Further corroborating Larry's admissions regarding Mobil's lack of control, D'Ambrisi testified that Mobil did not have any inspectors, supervisors or workers of its own at the site, but had, instead, contracted with Fluor to 'supervise, inspect, expedite and control all phases of the work.'

From all this, while it may be true that Mobil had the general right to stop work, monitor its completion and control access to the site, these were simply general rights it had as the ultimate employer on the construction project. See Restatement (Second) of Torts § 414, Comment *c*, at 388 (1965); *Pestka [v. Town of Fort Shedidan Co.]*, 371 Ill. App. 3d [286,] 301 [(2007)] ('recent decisions on this topic found that the reservation of a right to inspect, start and stop work, order changes to specifications and plans, and ensure that the work was done safely did not show that the general contractor retained control over the independent contractor's work'). By Larry's own admission, Mobil clearly did not control the means and method of his work, which would have otherwise imposed upon it a duty owed to him." *Gregory*, 384 Ill. App. 3d at 187-88.

¶ 72   Ultimately, "[w]hether a contractor retained such control over a subcontractor's work so as to give rise to liability is an issue reserved for a trier of fact, unless the evidence presented is insufficient to create a factual question." *Joyce*, 371 Ill. App. 3d at 74 (citing *Bokodi v. Foster Wheeler Robbins, Inc.*, 312 Ill. App. 3d 1051, 1059 (2000)). In this case, we are concerned with whether the property owner may be liable based on retained control over its general contractor, but neither party disputes section 414 and its comments apply to this situation. Donna contends the evidence is sufficient to raise factual questions of both vicarious and direct liability.

¶ 73                              Vicarious Liability Under Section 414

¶ 74   As discussed earlier, comment *a* to section 414 explains that an employer, by retaining control over the operative details of its independent contractor's work, may become vicariously liable for the contractor's negligence. See *Cochran*, 358 Ill. App. 3d at 876-77; Restatement (Second) of Torts § 414 cmt. a (1965). The best indicator of whether an employer has retained control over the independent contractor's work is the parties' contract, if one exists. See *Joyce*, 371 Ill. App. 3d at 74. This court, however, has also stated "[t]he central issue is retained control of the independent contractor's work, whether contractual, supervisory, operational[ ] or some mix thereof." *Martens*, 347 Ill. App. 3d at 318. Accordingly, we address each type of possible retained control in determining whether a genuine issue of material fact exists regarding vicarious liability.

¶ 75                              Contractual Control

¶ 76          In this case, the Agreement required Campanella to supervise and direct the work on the project. Under the Agreement, Campanella was solely responsible and had control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the work. Moreover, unless otherwise specified, Campanella was required to provide and pay for all labor, materials, equipment, and other facilities and services necessary for the proper execution and completion of the work. These basic provisions of the Agreement are evidence that Six Flags did not retain contractual control over Campanella's performance of the work. Moreover, the indemnity and insurance addendum provided Six Flags had no right to control the details of the contractor's work, or the means, methods or manner of the contractor's performance of the work under the Agreement.

¶ 77          Donna, however, relies on the general conditions and Safety Guidelines incorporated into the Agreement, as well as the Great America Requirements acknowledged and signed by Pete. Initially we note that requiring compliance with OSHA regulations does not create a duty of care. See *Calderon*, 381 Ill. App. 3d at 343. Moreover, "the existence of a safety program, safety manual or safety director does not constitute retained control *per se*; the court must still conduct an analysis pursuant to the section 414 retained control exception." *Martens*, 347 Ill. App. 3d at 318. A safety program or manual must sufficiently affect a contractor's means and methods of doing its work to bring the employer within the ambit of the retained control exception. *Cochran*, 358 Ill. App. 3d at 876; *Martens*, 347 Ill. App. 3d at 318-19.

¶ 78          Donna has catalogued the general conditions, Safety Guidelines and Great America Requirements, but she has not established which, if any, of them substantially affected the means and methods of Campanella's performance of the work. Donna first asserts the Great America Requirements establish Six Flags' authority to approve the type of fall protection Campanella used, but the Great America Requirements do not support that assertion. Rather, the Great America Requirements require all safety equipment be provided and inspected by the contractor (in this case, Campanella), and mandate OSHA-approved fall-protection equipment be worn where workers are at unprotected heights above six feet. Small testified the requirement for fall protection above a six-foot height was an OSHA regulation.

¶ 79          Donna also asserts the Safety Guidelines gave Six Flags the authority to provide alternative fall protection at Campanella's cost. The Safety Guidelines do generally provide that "[i]f Six Flags *** is required to provide personal protective or other safety equipment to aid in compliance, it reserves the right to do so at the expense of the contractor." Yet Donna does not set forth evidence that Six Flags was required to provide personal protective equipment in this case. Indeed, as noted earlier, the Great America Requirements require all safety equipment be provided and inspected by the contractor.

¶ 80          Donna observes the Safety Guidelines and Great America Requirements provide that Six Flags retained the right to inspect the project for unsafe conditions and to request the correction of unsafe conditions. These provisions do not create liability for the employer "unless the evidence shows the employer or general contractor retained control over the 'incidental aspects' of the independent contractor's work." *Rangel*, 307 Ill. App. 3d at 839; *Fris*, 255 Ill. App. 3d at 924.

¶ 81    Donna further notes the Great America Requirements mandated a contractor representative attend a health and safety orientation conducted by the Six Flags Great America safety department and bring a written scope of work, along with a list of materials to be used, to the orientation. The contractor representative was also required to review the policies and procedures with all contractor employees prior to commencement of the work. Moreover, all contractor employees would be required to attend a safety briefing at least weekly thereafter. Again, Donna does not explain how these requirements affected Campanella's means and methods of doing its work sufficiently to bring the employer within the ambit of the retained control exception. *Cochran*, 358 Ill. App. 3d at 876; *Martens*, 347 Ill. App. 3d at 318-19.

¶ 82    To the contrary, Pete testified the Great America Requirements did not contain safety guidelines that differed from his own safety standards and that there was nothing in the Six Flags safety requirements that changed how Campanella performed its work or altered the means or methods by which Campanella accomplished its work. Zupec testified he did not recall whether Six Flags' safety rules were ever discussed with the crew Campanella assigned to this project; to the extent safety rules were discussed, "most of them were discussed from Campanella's safety." Zupec also testified Campanella's own standards required its workers to wear hard hats and orange safety vests. Given this record, Donna has failed to establish the guidelines and requirements regarding safety briefings raise a genuine issue regarding retained control.

¶ 83    Lastly, Donna cites miscellaneous guidelines and requirements relating to fire and welding permits, chemical storage and disposal, use of vehicles on the premises, and Campanella employees' personal behavior. As with the other guidelines and requirements, Donna fails to explain or set forth evidence that any of these rules affected Campanella's means or methods of performing the work in this case. For example, the Six Flags guideline barring Campanella employees from fighting at the work site has nothing to do with how Campanella would accomplish the work required by the Agreement.

¶ 84    Donna primarily relies on two decisions of this court to argue the general conditions, Safety Guidelines and Great America Requirements raise a genuine issue of material fact on the issue of retained control.[7] In *Bokodi*, the court found a genuine issue existed regarding retained control, where the general contractor provided 29 safety measures and procedures that subcontractors were required to follow, employed safety personnel to monitor the site for compliance with its safety guidelines, gave its own employees broad powers to halt any subcontractor work based on a perception of an unsafe working environment, required subcontractors to conduct safety training meetings that the general contractor's employees

---

[7]Donna also relies upon *O'Neill v. Ford Motor Co.*, No. 05 C 7316, 2009 WL 4757268 (N.D. Ill. Dec. 9, 2009), an unpublished decision of the federal district court for the Northern District of Illinois. This court, however, has often declined to consider unpublished federal decisions. See, *e.g.*, *Horwitz v. Sonnenschein Nath & Rosenthal, LLP*, 399 Ill. App. 3d 965, 976 (2010); *Burnette v. Stroger*, 389 Ill. App. 3d 321, 329 (2009). Moreover, the *O'Neill* court, contrary to this court's decisions, followed Seventh Circuit precedent rejecting the idea that section 414 may result in vicarious liability. *O'Neill*, 2009 WL 4757268, at *13 (citing *Aguirre v. Turner Construction Co.*, 501 F.3d 825, 829 (7th Cir. 2007)). Accordingly, *O'Neill* is inapposite here.

could monitor, and required subcontractors to participate in its own safety programs. *Bokodi*, 312 Ill. App. 3d at 1063. In *Wilkerson*, the court found that there was a genuine issue of fact regarding retained control where: the contractor had the authority to stop the subcontractor's work in the event of a safety hazard; the subcontractor was contractually required to attend safety meetings and comply with the general contractor's list of 21 safety procedures; and the subcontractor was required to submit for the general contractor's approval a site-specific safety plan and minutes of the subcontractor's own weekly safety meetings. *Wilkerson*, 379 Ill. App. 3d at 497. The *Wilkerson* court found the case most similar to *Bokodi*. *Id*.

¶ 85    We initially note that *Bokodi* and *Wilkerson* are both cases more addressed to direct, rather than vicarious, liability under section 414. See *Wilkerson*, 379 Ill. App. 3d at 493-94; *Bokodi*, 312 Ill. App. 3d at 1064. The *Bokodi* decision relied on this court's earlier decisions in *Pasko v. Commonwealth Edison Co*., 14 Ill. App. 3d 481 (1973), and *Weber v. Northern Illinois Gas Co*., 10 Ill. App. 3d 625 (1973). *Bokodi*, 312 Ill. App. 3d at 1064. Neither *Pasko* nor *Weber*, however, draws a clear distinction between direct liability and vicarious liability; thus, while some language in *Pasko* and *Weber* may suggest a liberal standard as to the degree of control sufficient to impose vicarious liability, these cases have been superceded by our more recent decisions. *Cochran*, 358 Ill. App. 3d at 878 (and cases cited therein). These more recent decisions incorporate comment *c* of section 414 into the duty analysis. *Martens*, 347 Ill. App. 3d at 319. For example, the *Martens* court reasoned that if general contract language establishing a safety program and maintaining reasonable safeguards was sufficient by itself to establish liability under section 414, "then the distinction in Comment *c* to section 414 between retained control versus a general right of control would be rendered meaningless." *Id*. at 316.

¶ 86    Donna also relies on Illinois Pattern Jury Instructions, Civil, No. 55.01 (2011), which provides:

> "A[n] [owner] [contractor] [other] who entrusts work to a [subcontractor] [contractor] [other] can be liable for injuries resulting from the work if the [owner] [contractor] [other] retained some control over the safety of the work and the injuries were proximately caused by the [owner's] [contractor's] [other's] failure to exercise that control with ordinary care."

This court, however, has recently held this instruction does not accurately state the law of construction negligence. *Ramirez v. FCL Builders, Inc*., 2014 IL App (1st) 123663, ¶ 165. The *Ramirez* court reached this conclusion in part because the language of the instruction did not include the explanation of "retained control" found in the comment *c* to section 414 or recent case law (not cited by the committee comments), which consistently finds no control where there is only a general right to control. *Ramirez*, 2014 IL App (1st) 123663, ¶¶ 169-70. The analysis in *Ramirez* on this point is thus consistent with the evolution in our case law as expressed in *Cochran* and *Martens*. Accordingly, we do not find the instruction any more persuasive in this context than Donna's reliance on *Bokodi*.

¶ 87    For all of these reasons, we conclude the degree of contractual control, by itself does not establish a genuine issue of material fact regarding retained control.

Supervisory Control

¶ 89     We next consider whether Six Flags supervised Campanella's work or maintained an extensive work site presence. " '[P]ervasive supervision and monitoring' may lead to the imposition of a duty pursuant to section 414 of the Restatement ***." *Calderon*, 381 Ill. App. 3d at 346-47 (quoting *Shaughnessy v. Skender Construction Co.*, 342 Ill. App. 3d 730, 739 (2003)). Yet even multiple daily employer visits to a work site will not raise a genuine issue of retained control where the employer's responsibility was primarily focused on checking daily progress, not supervising the manner in which the work was done. *Rogers v. West Construction Co.*, 252 Ill. App. 3d 103, 106, 109 (1993); see *Calderon*, 381 Ill. App. 3d at 347; *Joyce*, 371 Ill. App. 3d at 75.

¶ 90     Examining the testimony of Six Flags' personnel, Small testified Campanella was not required to submit a daily work report, describing it as a standard, but not a routine, practice which was enforced. Except for the initial meeting before work began, Small had no other meetings with anyone from Campanella before Thomas fell. Small indicated he drove past the work site on one occasion, but did not observe anyone working on the ride or speak to any Campanella employees at that time.

¶ 91     Pohlman, Six Flags' representative for the project, visited the work site "from time to time" to check on the progress of the project. Pohlman did not speak to Campanella's workers about the tasks they performed and never observed anything amiss or unsatisfactory to cause him to request the work be performed in a different manner.

¶ 92     Pearsall visited the work site two or three times weekly. His conversations with Campanella workers would be "small talk" about the progress of the work. Pearsall did not recall Campanella workers mentioning any problems to him. Pearsall did not provide suggestions or instructions to Campanella's workers. Pearsall observed Campanella workers using fall protection, but he did not recall having any conversations with Campanella personnel regarding fall protection. Pearsall did not know who, if anyone, from Six Flags was monitoring Campanella's work for compliance with the fall-protection requirements.

¶ 93     As to the testimony of Campanella's personnel, Pete could not recall the number of times he observed Pohlman and Pearsall at the site prior to Thomas's fall. Zupec testified that, in general, Pearsall would be present daily to ensure Campanella was working. Zupec did not recall any particular conversations with Pearsall while at the work site. Zupec also did not recall any conversation with Pohlman about the job after work commenced. Zupec further did not think Pohlman contacted any other Campanella personnel after work commenced, because he would have learned of such contact.

¶ 94     The deposition testimony also generally establishes that Six Flags' personnel had the authority to intervene if they observed unsafe working conditions, and Campanella would have responded to any concerns Six Flags' personnel raised. Yet the record also establishes Six Flags' personnel limited its involvement almost exclusively to monitoring Campanella's progress on the project. Six Flags visited the work site to gauge how much of the work had been completed, but did not supervise the manner in which its contractor was performing the work. See *Rogers*, 252 Ill. App. 3d at 106, 109; *Calderon*, 381 Ill. App. 3d at 347; *Joyce*, 371 Ill. App. 3d at 75. The record does not establish any instance where Six Flags intervened for

safety reasons, let alone the pervasive supervision of the work sufficient to raise a genuine issue regarding retained control.

¶ 95                                    Operational Control

¶ 96        Regarding operational control, we examine whether the contractor was free to perform the work in its own way, which personnel provided supplies and gave directions to the workers, and whether the employer was present during the incident. See *Martens*, 347 Ill. App. 3d at 319. In this case, Pete testified Six Flags exercised no control over the operational details of this job. Campanella required and supplied safety harnesses for its employees working at heights. Zupec testified he and Thomas provided the only supervision given to Campanella employees on the project. Thomas was not following any instruction from Six Flags in performing his work. Six Flags' personnel were not present at the work site on the date of the incident until after Thomas fell.

¶ 97        In sum, Donna has failed to raise a genuine issue of fact regarding retained control based on contractual, supervisory, or operational control over the project. Of course, a party may raise a genuine issue of fact regarding retained control through some mix of these forms of control. *Martens*, 347 Ill. App. 3d at 318. In this case, however, the evidence as to any form of control is insufficient to raise a genuine issue of material fact on the issue of vicarious liability. Accordingly, we conclude as a matter of law there is no vicarious liability on the part of Six Flags.

¶ 98                          Direct Liability Under Section 414

¶ 99        We next consider whether Six Flags retained sufficient supervisory control such that it "may be directly liable for not exercising [its] supervisory control with reasonable care." See *Cochran*, 358 Ill. App. 3d at 874. We determine whether Six Flags superintended the entire job, in which case Six Flags may be subject to liability for failing to prevent its contractors from doing even the details of the work in a way unreasonably dangerous to others, if it knew or by the exercise of reasonable care should have known the contractors' work was being so done, and had the opportunity to prevent it by exercising the power of control which Six Flags retained. See Restatement (Second) of Torts § 414 cmt. b (1965). Six Flags would also be subject to liability if it knew or should have known the contractors have carelessly done their work in such a way as to create a dangerous condition, and failed to exercise reasonable care either to remedy it or by the exercise of its control cause the contractor to remedy it. See *id*. The best evidence of this sort of liability is the employer's actual exercise of its discretionary authority to stop its contractor's work. See *Calderon*, 381 Ill. App. 3d at 344; *Wilkerson*, 379 Ill. App. 3d at 497. This court has also considered whether the employer required compliance with extensive safety guidelines, conducted regular safety meetings and regular safety inspections, and whether the employer was required to approve the site safety plan and the minutes of the contractor's safety meetings. See *Wilkerson*, 379 Ill. App. 3d at 497; *Bokodi*, 312 Ill. App. 3d at 1063.

¶ 100    Six Flags first argues that Donna has forfeited any argument as to direct liability on appeal by failing to cite authority supporting it in her appellate brief. Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013) states that the appellant's brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Generally, arguments unsupported by citation of proper authority are forfeited. *E.g.*, *Nelson v. County of Kendall*, 2013 IL App (2d) 120635, ¶ 9. In this case, however, as previously noted, Donna has cited *Wilkerson* and *Bokodi*, which are direct liability cases. Although we have already explained why *Wilkerson* and *Bokodi* do not fully reflect the current state of the case law, we conclude Donna's citation of these cases suffices to avoid forfeiture of her direct liability argument.

¶ 101    On the merits, the record establishes Six Flags did not superintend the job. Indeed, the testimony from Burg, Donna's own expert witness, faults Six Flags for failing to perform the role of superintendent over its contractors.[8] Six Flags required Campanella to submit a safety plan and to comply with its safety requirements, but these were not substantially different from Campanella's own safety standards. Six Flags did not conduct regular safety meetings and regular safety inspections, and there is no indication Six Flags exercised any authority it had to stop Campanella's work.

¶ 102    In her brief, Donna also asserts Six Flags personnel had actual and constructive knowledge of the hazardous condition created when the gearbox was removed, a hole on the platform was created thereby, and Campanella's fall protection equipment was inadequate. The employer's " 'knowledge, actual or constructive, of the unsafe work methods or a dangerous condition is a precondition to direct liability.' " *Calderon*, 381 Ill. App. 3d at 347 (quoting *Cochran*, 358 Ill. App. 3d at 879-80). Yet where the employer "has an insufficient opportunity to observe unsafe working conditions, then knowledge will not be inferred and direct liability will not ensue." *Calderon*, 381 Ill. App. 3d at 347.

¶ 103    For example, in *Madden v. F.H. Paschen/S.N. Nielson, Inc.*, 395 Ill. App. 3d 362, 364-65 (2009), Madden, a maintenance worker employed at Amos Alonzo Stagg High School (Stagg High School), was setting up a projection screen on the stage of the school's theater when he stepped backwards and accidentally fell into the theater's uncovered orchestra pit. He alleged that the resulting nine-foot drop caused him severe injuries that left him permanently disabled. *Id.* at 365. As the Stagg High School theater had been under construction, Madden brought a negligence action against general contractor F.H. Paschen/S.N. Nielson, Inc. (Paschen), construction manager Jacobs Facilities, Inc. (Jacobs), architect VOA & Associates (VOA), and the design consultant retained by VOA for the project, Schuler & Shook (Schuler), seeking damages for his injuries. *Id.* The trial court granted summary judgment in favor of defendants

---

[8]In his deposition, Burg suggested Six Flags was legally required to superintend the job, but Donna made no such argument in her opposition to the motion for summary judgment or in this appeal. Thus, it is significant that Burg's assessment of the facts is consistent with the deposition testimony from both Six Flags' and Campanella's personnel on this point, which is detailed in our discussion of whether Six Flags exercised supervisory control over Campanella's work on the project.

- 23 -

Paschen, Schuler, and Jacobs; Madden appealed the summary judgments entered in favor of Schuler and Jacobs. *Id.*

¶ 104   On appeal, this court rejected Madden's argument that Schuler and Jacobs could be directly liable under section 414 of the Restatement (Second) of Torts:

"The record shows that neither defendant had contact with Madden on the night of his accident, and there is no evidence that they knew or could have known that he would be setting up a screen in the theater, let alone his dangerous proximity to the pit while performing the action, or that they retained any control that would enable them to prevent him from carrying on this action in such a dangerous manner." *Id.* at 385.

¶ 105   In this case, even assuming Six Flags retained sufficient control to have prevented Thomas' fall, there is no evidence Six Flags personnel had any contact with the job site on the date of the incident, knew the platform would be removed, or that Thomas would remove his fall protection gear. Pohlman did not specifically discuss the use of fall protection on the platform with Pete. Pearsall did not recall having any conversations with Campanella personnel to plan what would happen after the gear box was removed. Zupec was unsure whether the platform and gearbox would be removed together or separately. Zupec and Thomas first discussed removing the entire platform versus removing the gear box separately approximately one week before the gear box was ultimately removed. Zupec did not recall discussing the hole that would be created by removing the gear box with Thomas or any Six Flags personnel.

¶ 106   Based on this record, there is no evidence Six Flags' personnel knew or should have known Campanella planned to remove the gearbox from the platform separately, instead of removing the entire platform, and did not know of the conditions at the jobsite at the time of the injury. Thus, while Pearsall knew in general that removing the gear box would leave a hole in the platform at the top of the structure, the record does not establish Six Flags' personnel knew or should have known Campanella was performing the work in an unsafe manner or creating a hazardous condition. See *Cochran*, 358 Ill. App. 3d at 879-80.

¶ 107   In short, Donna has failed to show a genuine issue of material fact existed regarding Six Flags' alleged direct liability for the incident at issue. Given our earlier conclusion that Donna also failed to raise a genuine issue of fact regarding vicarious liability in this matter, we conclude the circuit court did not err in entering summary judgment on Donna's construction negligence claims.

¶ 108                         Premises Liability Under Section 343

¶ 109   We now consider whether summary judgment was properly granted on plaintiff's premises liability theory. "A possessor of land can be liable for physical harm caused to his invitees by a dangerous condition on the land *if* the defendant knew or should have known that the condition involved a reasonable risk of harm." (Emphasis in original.) *Wilkerson*, 379 Ill. App. 3d at 497 (citing Restatement (Second) of Torts § 343 (1965)). The possessor of land, however, will not be liable where there is no evidence of such knowledge. *Joyce*, 371 Ill. App. 3d at 80; *Cochran*, 358 Ill. App. 3d at 873.

¶ 110　　As previously discussed, the record does not establish a genuine issue regarding Six Flags' actual or constructive knowledge of the conditions that resulted in the incident at issue in this case. Similarly, the record does not establish a genuine issue regarding Six Flags' actual or constructive knowledge of the creation of the condition by the decision to remove the gearbox first, given Six Flags' awareness that Campanella provided fall-protection equipment to its employees working at heights. Accordingly, the circuit court did not err in entering summary judgment on Donna's premises liability claims.

¶ 111　　　　　　　　　　　　　　　　　　CONCLUSION

¶ 112　　For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 113　　Affirmed.